823 So.2d 73 (2002)
Mary BARLEY, etc., et al., Petitioners,
v.
SOUTH FLORIDA WATER MANAGEMENT DISTRICT, Respondent.
No. SC00-1998.
Supreme Court of Florida.
April 11, 2002.
Rehearing Denied July 19, 2002.
E. Thom Rumberger of Rumberger, Kirk & Caldwell, P.A., Tallahassee, FL; Richard Keller, Christopher T. Hill and Suzanne Barto Hill of Rumberger, Kirk & Caldwell, P.A., Orlando, FL; and Jon Mills and Timothy McLendon, Gainesville, FL, for Petitioners.
Paul L. Nettleton of Carlton Fields, P.A., Miami, FL; and Ruth P. Clements of South Florida Water Management District, Office of Counsel, West Palm Beach, FL, for Respondent.
Roy C. Young, General Counsel, Young, van Assenderp, Varnadoe & Anderson, P.A., Tallahassee, FL; and William H. Green, David L. Powell, and Gary V. Perko, Special Counsel, Hopping Green & Sams, P.A., Tallahassee, FL, for Florida Chamber of Commerce, Inc., Amicus Curiae.
William L. Hyde of Gunster, Yoakley & Stewart, P.A., Tallahassee, FL; and Daniel S. Pearson and Brett A. Barfield of Holland & Knight LLP, Miami, FL, for United States Sugar Corporation, Amicus Curiae.
Mary Jill Hanson of Hanson, Perry & Jensen, P.A., West Palm Beach, FL, for International Association of Machinists and Aerospace Workers, AFL-CIO, Amicus Curiae.
PER CURIAM.
We have for review Barley v. South Florida Water Management District, 766 *74 So.2d 433 (Fla. 5th DCA 2000), a decision of the Fifth District Court of Appeal which expressly declared a Florida statute valid and expressly construed a provision of the Florida Constitution. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
Petitioners are property owners within an area designated by section 373.0693(10), Florida Statutes (1993), as the Okeechobee Basin. This basin is within an area regulated by respondent South Florida Water Management District (District). Respondent is authorized under article VII, section 9 of the Florida Constitution and sections 373.503 and 373.0697, Florida Statutes (1993), to levy ad valorem taxes on property within the District.
Section 373.4592, Florida Statutes (Supp.1994), is known as the Everglades Forever Act (EFA). The Everglades Agricultural Area (EAA) is an area of property described in section 373.4592(15). The Everglades Protection Area (EPA) refers to certain areas described in section 373.4592(2)(h). The Everglades Construction Project (ECP) is a project described in section 373.4592(2)(f).
Section 373.4592(4)(a) provides for implementation of the ECP. This section also provides: "The district shall not levy ad valorem taxes in excess of 0.1 mill within the Okeechobee Basin for the purpose of the design, construction, and acquisition of the Everglades Construction Project." Id. Section 373.4592(6) provides for the imposition of an annual Everglades Agricultural Privilege Tax. Section 373.4592(8), in respect to special assessments, provides that special assessments may be created for property not subject to the Everglades Agricultural Privilege Tax.
Petitioners filed an action in the Circuit Court of the Ninth Judicial Circuit in and for Orange County. That action sought a declaration that respondent's levy of a 0.1 mill ad valorem tax pursuant to section 373.4592(4)(a) to abate pollution in the EAA and the additional ad valorem taxes levied under respondent's ad valorem taxing authority for other pollution abatement costs attributable to polluters in the EAA violate article II, section 7(b), Florida Constitution,[1] as applied to petitioners and other similarly situated property owners within the Okeechobee Basin. The petitioners alleged that they were non-polluters and that the polluters within the EAA were not at that time paying for 100 percent of the costs of abating the pollution they caused. Petitioners also sought a declaration that section 373.4592(8)(a) violates article II, section 7(b), because section 373.4592(8)(a) prohibited respondent from raising additional revenues from EAA polluters who were not paying for 100 percent of the costs of abating the pollution they caused.
This case presents to us the issue of the application of the EFA-authorized 0.1 mill ad valorem tax subsequent to the adoption by the voters of the initiative known as Amendment 5, which is now article II, section 7(b), Florida Constitution. Our review begins with the history of the EFA and of article II, section 7(b).

HISTORY
The EFA was passed by the Legislature in its regular session in 1994. The purpose and intent of the legislation in enacting the EFA are set forth at length in *75 section 373.4592(1)(a)-(h). The goal of the EFA includes reducing pollution flowing from the EAA into the EPA.
Also in 1994, this Court considered a citizens' initiative to amend the Constitution so as to include provisions concerning the restoration and protection from pollution of the Everglades.[2]See In re Advisory Opinion to the Attorney Gen.Save Our Everglades, 636 So.2d 1336 (Fla.1994). The initiative had the following summary:
Creates the Save Our Everglades Trust to restore the Everglades for future generations. Directs the sugarcane *76 industry, which polluted the Everglades, to help pay to clean up pollution and restore clean water supply. Funds the Trust for twenty-five years with a fee on raw sugar from sugarcane grown in the Everglades Ecosystem of one cent per pound, indexed for inflation. Florida citizen trustees will control the Trust.
Id. at 1338. In reviewing the proposed amendment, this Court stated that we were "limited to two inquiries: whether the amendment addresses but a single subject, and whether the amendment's title and summary are sufficiently clear." Id. at 1339. We concluded that the initiative was in violation of the single subject requirement because the initiative performed functions of each branch of government creating "a virtual fourth branch of government with authority to exercise the powers of the other three on the subject of remedying Everglades pollution." Id. at 1340. Therefore, the initiative did not proceed to the ballot.
In 1996, this Court had for review three separate initiative petitions concerning the Everglades, which we addressed in one opinion. See Advisory Opinion to Attorney Gen.Fee on Everglades Sugar Prod., 681 So.2d 1124 (Fla.1996).[3] The *77 title and summary for the first petition concerning the proposed fee was:
TITLE: FEE ON EVERGLADES SUGAR PRODUCTION
SUMMARY: Provides that the South Florida Water Management District shall levy an Everglades Sugar Fee of 1 [cent] per pound on raw sugar grown in the Everglades Agricultural Area to raise funds to be used, consistent with statutory law, for purposes of conservation and protection of natural resources and abatement of water pollution in the Everglades. The fee is imposed for twenty-five years.
Id. at 1127. The title and summary for the second petition concerning the Trust Fund was:
TITLE: EVERGLADES TRUST FUND
SUMMARY: Establishes an Everglades Trust Fund to be administered by the South Florida Water Management District for purposes of conservation and protection of natural resources and abatement of water pollution in the Everglades. The Everglades Trust Fund may be funded through any source, including gifts and state or federal funds.
Id. at 1129. The title and summary for the third petition, concerning the proposed responsibility amendment, was:
TITLE: RESPONSIBILITY FOR PAYING COSTS OF WATER POLLUTION ABATEMENT IN THE EVERGLADES
SUMMARY: The Constitution currently provides the authority for the abatement of water pollution. This proposal adds a provision to provide that those in the Everglades Agricultural Area who cause water pollution within the Everglades Protection Area or the Everglades Agricultural Area shall be primarily responsible for paying the costs of the abatement of that pollution.
Id. at 1130.
Again, the two issues before this Court were whether the amendments addressed but a single subject and whether the amendments' titles and summaries were sufficiently clear. In this 1996 decision, we held that each of the initiatives met these requirements, and the initiatives proceeded to the ballot.
Regarding the Fee on Everglades Sugar Production initiative, we held that the initiative *78 proposed a clear, single question to the voters: "Should the sugar industry pay a penny a pound towards Everglades restoration?" Id. at 1128.
Regarding the Everglades Trust Fund initiative, we held that the initiative had "a single, limited purpose: the creation of a trust to receive and disperse funds for Everglades conservation." Id. at 1130.
We likewise upheld the Responsibility for Paying Costs of Water Pollution Abatement in the Everglades initiative against the contention that the initiative violated the single subject requirement. We stated:

The initiative has a limited and focused objective: Those who cause water pollution within the Everglades Protection Area or the Everglades Agricultural Area shall be primarily responsible for paying the costs of the abatement of that pollution. We also conclude that the ballot title and summary are not misleading. The Responsibility initiative makes clear that those in the Everglades Protection Area or the Everglades Agricultural Area who cause water pollution will pay for their pollution.
Id. at 1130-31 (emphasis added).
The three initiatives were on the ballot in the general election in 1996. The fee initiative was not approved by the voters. The trust fund initiative was approved and is now article X, section 17, Florida Constitution. The responsibility initiative was approved and is now article II, section 7(b), which we consider here.
The adopted article II, section 7(b), was, in March 1997, the subject of a request from the Governor for an advisory opinion pursuant to article IV, section 1(c). We responded to the Governor in Advisory Opinion to the Governor1996 Amendment 5 (Everglades), 706 So.2d 278 (Fla. 1997) (hereinafter 1997 Advisory Opinion). In his request to us, the Governor wrote:
As background, it should be noted that the "Everglades Forever Act" was enacted after many years of litigation involving the United States of America, the State of Florida, the South Florida Water Management District, the Department of Environmental Protection, and certain large agricultural interests to determine how and at whose expense pollution of the Everglades should be abated. s. 373.4592, Fla. Stat.
The Everglades Forever Act established two funding sources for pollution abatement in the Everglades Agricultural Area (EAA); that is, the Everglades agricultural privilege tax, and the levy of a 0.1 mill ad valorem tax on property within the Okeechobee Basin. Ss. 373.4592(6) and (4)(a). Therefore, the law in effect at the time of the adoption of Amendment 5 was designed to divide the burden of the costs of pollution abatement on the public by the 0.1 mill tax and the agricultural users by the privilege tax of $24.89 per acre.
I.
Prior to the time that the debate on these issues rose to the current pitch, the Attorney General opined that Amendment 5 was self-executing. Op. Att'y Gen. Fla. 96-92 (1996). Other government entities have suggested an opinion that the amendment is not self-executing; that too many policy determinations remain unanswered. These entities question any agency's ability to determine rights and responsibilities, the purposes intended to be accomplished, and the means by which the purposes may be accomplished.
Due to the uncertainty created by the unclear language of Amendment 5, the *79 South Florida Water Management District and the Department of Environmental Protection, the governmental entities charged with enforcing the Everglades pollution abatement initiatives, are unable to move forward to enforce this amendment without a clear interpretation as to its meaning and effect. As Governor, I am responsible for providing these executive agencies with direction as to their enforcement responsibilities, to see that the law is faithfully executed, and to report on the state's progress in restoring the Everglades System.
II.
Several divergent interpretations have been suggested by interested parties as to the meaning of "primarily responsible." Some government agencies believe that "primarily responsible" could mean something in excess of fifty percent. Therefore, polluters within the EAA are chiefly, but not totally, responsible for the costs of abatement. They also believe that whether these costs are to be apportioned according to the amount of pollution contributed, and whether and to what extent other entities not described in Amendment 5 are responsible for pollution abatement costs, is not clear from the text of Amendment 5 and is subject to clarification.
Proponents of Amendment 5 have opined that the amendment imposes the entire cost of abatement on polluters within the EAA. Only upon failure of the primarily responsible parties to satisfy the costs of abatement would a secondarily responsible party (the public) be called upon to satisfy the obligation. As the state's chief administrative officer responsible for planning and budgeting, I am in doubt as to my duties in seeing that Amendment 5 is being faithfully executed.
CONCLUSION
The consequences of these determinations are substantial and of immense importance to the well-being of the state and of the future of the Florida Everglades. Years of litigation have transpired, which has delayed implementation of the necessary steps to clean up this international treasure. The lack of clarity in Amendment 5 promises to engender further litigation absent an expeditious resolution of the questions I am posing.
For the foregoing reasons, I respectfully request the opinion of the Justices of the Supreme Court on the following questions affecting my executive duties and responsibilities:
1. Is the 1996 Amendment 5 to the Florida Constitution self-executing, not requiring any legislative action considering the existing Everglades Forever Act? Or is the Legislature required to enact implementing legislation in order to determine how to carry out its intended purposes and defining any rights intended to be determined, enjoyed, or protected?
2. What does the term "primarily responsible" as used in 1996 Amendment 5 to the Florida Constitution, mean? Does it mean responsible for more than half of the costs of abatement, or responsible for a substantial part of the costs of abatement, or responsible for the entire costs of the abatement, or does it mean something different not suggested here?
1997 Advisory Opinion, 706 So.2d at 279-80 (quoting Governor Lawton Chiles's letter dated March 6, 1997).
*80 Before answering the Governor's questions, "To ensure full and fair consideration of the issues raised, we permitted interested persons to file briefs and to present oral argument before the Court."[4]Id. at 281. We then specifically answered the questions the Governor presented to us:
As to your first question, that is, whether Amendment 5 is self-executing, we are guided by the test set forth in Gray v. Bryant, 125 So.2d 846 (Fla. 1960), which stated that
whether a constitutional provision should be construed to be self-executing, or not self-executing, is whether or not the provision lays down a sufficient rule by means of which the right or purpose which it gives or is intended to accomplish may be determined, enjoyed, or protected without the aid of legislative enactment.

Id. at 851. Applying the aforementioned test, we conclude that Amendment 5 is not self-executing [n.4] and cannot be implemented without the aid of legislative enactment because it fails to lay down a sufficient rule for accomplishing its purpose. As you suggest in your letter, "too many policy determinations remain unanswered ... [such as the various] rights and responsibilities, the purposes intended to be accomplished, and the means by which the purposes may be accomplished." Amendment 5 raises a number of questions such as what constitutes "water pollution"; how will one be adjudged a polluter; how will the cost of pollution abatement be assessed; and by whom might such a claim be asserted.
[n.4]. We disagree with the opinion of the Attorney General. Op. Att'y Gen. Fla. 96-92 (1996) (Opining that Amendment 5 is self-executing.)
. . . .

The second part of your first question asks whether legislative action is required in light of the pre-existing Everglades Forever Act.[n.5] We answer in the affirmative. In cases where the constitutional provision is not self-executing, such as the instant case, "all existing statutes which are consistent with the amended Constitution will remain in effect until repealed by the Legislature." In re Advisory Opinion to the Governor, 132 So.2d 163, 169 (Fla.1961). We find no inconsistency between the Everglades Forever Act and Amendment 5. As you noted in your letter, the "Everglades Forever Act was enacted ... to determine how and at whose expense pollution of the Everglades should be abated." Amendment 5 was adopted for a similar purposeto require polluters to pay for the abatement of their pollution. Notwithstanding the mutuality of subject matter, we do not construe the Everglades Forever Act to be the enabling legislation for Amendment 5.
[n.5]. § 373.4592, Fla. Stat. (1995).
Based on our review of the pre-election publicity and promotion, most of which focused on Amendment 4, the "sugar tax" amendment, and some of which included discussion of the Everglades Forever Act, we conclude that the voters intended to defeat the penny per pound sugar tax and adopt Amendment 5, which requires polluters to pay "the costs of abatement of that pollution." We believe the voters adopted Amendment 5 to effect a change, and construing the Everglades Forever Act as Amendment 5's implementing legislation would effect no change, nullify *81 the Amendment, and frustrate the will of the people. We therefore glean that in adopting Amendment 5, the voters expected the legislature to enact supplementary legislation to make it effective, to carry out its intended purposes, and to define any rights intended to be determined, enjoyed, or protected.

Your second question asks us to construe the phrase "primarily responsible" as used in Amendment 5.... In the context of the amendment, we find that the voters contemplated the phrase "primarily responsible" to be a recognition that no one person or entity is responsible for 100% of the pollution in the Everglades Agricultural Area (EAA) or the Everglades Protection Area (EPA), but those within the EAA who are determined to be responsible must pay their share of the costs of abating that pollution. Voters reading the ballot summary or the entire amendment would most likely understand that the words "primarily responsible" would be applied in accordance with their ordinary meaning to require that individual polluters, while not bearing the total burden, would bear their share of the costs of abating the pollution found to be attributable to them.
In conclusion, we answer your inquiries by finding that (1) Amendment 5 is not self-executing; (2) the amendment requires implementing legislation, notwithstanding the existence of the Everglades Forever Act; and (3) the words "primarily responsible" require those in the EAA who cause water pollution in the EPA or EAA to bear the costs of abating that pollution.
Advisory Opinion to the Governor1996 Amendment 5 (Everglades), 706 So.2d 278, 281-83 (Fla.1997) (emphasis added) (second alteration and first and third omissions in original) (some footnotes omitted).

THE INSTANT CASE
In the circuit court, respondent answered the petitioner's amended complaint and thereafter moved for a judgment on the pleadings. The circuit court granted respondent's motion and held the following in its order:
10. In the Florida Supreme Court's advisory opinion to Florida's Governor on Amendment 5, Advisory Opinion to the Governor1996 Amendment 5 (Everglades), 706 So.2d 278 (Fla.1997) ("Advisory Opinion-Amendment 5"), the supreme court addressed three questions posed by the Governor: (1) is Amendment 5 self-executing or does it require enabling legislation?; (2) assuming Amendment 5 is not self-executing, is legislative action required to make it effective in light of the pre-existing Everglades Forever Act?; and (3) what is the meaning of "primarily responsible" as used in Amendment 5? In summary, the supreme court ultimately determined that Amendment 5 is not self-executing, that legislative action is required to implement Amendment 5 and that the Act could not be deemed the implementing legislation, and that "primarily responsible" in Amendment 5 should be given its ordinary meaning, to wit: "individual polluters, while not bearing the total burden, would bear their share of the costs abating the pollution found to be attributable to them." Id. at 283.
11. Specifically relevant to the instant motion, the Florida Supreme Court considered the consistency between Amendment 5 and the Act in question. In discussing whether legislative action was required in light of the pre-existing Everglades Forever Act, the court reaffirmed its earlier holding in In re Advisory Opinion to the Governor, 132 So.2d 163 (Fla.1961), and expressly *82 found that there was no inconsistency between the Everglades Forever Act and Amendment 5. While the court then noted the similarity in purpose between the Everglades Forever Act and Amendment 5, it is obvious that the court reviewed the totality of the Act to determine that the Act was not the enabling legislation for Amendment 5.
12. Based on the standard for reviewing the impact of non self-executing constitutional provisions and the Florida Supreme Court's discussion of the consistency of the Everglades Forever Act and Amendment 5 in Advisory Opinion to the Governor1996 Amendment 5 (Everglades), 706 So.2d 278 (Fla.1997), this Court finds that a cause of action would not be established by proving plaintiff's allegations.
Barley v. South Florida Water Mgmt. Dist., No. CI97-10228, order at 5-6 (Fla. 9th Cir. Ct. order filed Oct. 22, 1998).
Petitioners appealed the circuit court's order granting the respondent's motion for judgment on the pleadings. In a divided decision, the Fifth District affirmed the circuit court's order. See Barley v. South Florida Water Mgmt. Dist., 766 So.2d 433 (Fla. 5th DCA 2000). The Fifth District determined that in 1997 Advisory Opinion, this Court answered the issues presented by the petitioner's petition for declaratory judgment. See id.
Before us, petitioners argue that this is not 1997 Advisory Opinion revisited. Petitioners contend that, unlike the issues of facial consistency with the EFA and article II, section 7(b), which were considered in 1997 Advisory Opinion, the instant case presents factual issues and an as-applied constitutional challenge to the respondent's discretionary 0.1 mill tax levy on the owners of property within the Okeechobee Basin who are non-polluters. Petitioners claim that since 1997 Advisory Opinion held that the meaning of primarily responsible in article II, section 7(b), was that polluters are to pay the costs related to the pollution the polluters cause, it necessarily follows that non-polluters are constitutionally protected from paying any of the costs of pollution abatement.[5] Thus, petitioners contend that this Court's interpretation of article II, section 7(b), in 1997 Advisory Opinion establishes an implied right to not have to contribute for pollution abatement in the EPA or EAA. We disagree.
We agree with the Fifth District that our 1997 Advisory Opinion has answered the fundamental issues in this case and that the circuit court's following our 1997 Advisory Opinion is to be affirmed. We have consistently stated that "[w]hile advisory opinions to the Governor are not binding judicial precedents, they are frequently very persuasive and usually adhered to." Lee v. Dowda, 155 Fla. 68, 19 So.2d 570, 572 (1944). Regarding advisory opinions concerning initiative opinions, we recently reiterated in Ray v. Mortham, 742 So.2d 1276, 1285 (Fla.1999), that "although our advisory opinions are not strictly binding precedent in the most technical sense, only under extraordinary circumstances will we revisit an issue decided in our earlier advisory opinions." Regarding article II, section 7(b), we have issued an advisory opinion regarding the validity of the initiative which resulted in article II, section 7(b), being placed on the ballot, and we have issued an advisory opinion to the Governor regarding the consistency between the EFA and article II, *83 section 7(b), after the initiative was approved by the voters.
In 1997 Advisory Opinion, we specifically determined that article II, section 7(b), is not self-executing and then expressly reiterated our precedent:
In cases where the constitutional provision is not self-executing, such as the instant case, "all existing statutes which are consistent with the amended Constitution will remain in effect until repealed by the Legislature." In re Advisory Opinion to the Governor, 132 So.2d 163, 169 (Fla.1961).
1997 Advisory Opinion, 706 So.2d at 281-82. We then expressly found "no inconsistency between the Everglades Forever Act and Amendment 5." Id. at 282. We made these determinations in response to the Governor's letter, which stated that the need for the advisory opinion was:
Due to the uncertainty created by the unclear language of Amendment 5, the South Florida Water Management District and the Department of Environmental Protection, the governmental entities charged with enforcing the Everglades pollution abatement initiatives, are unable to move forward to enforce this amendment without a clear interpretation as to its meaning and effect.
1997 Advisory Opinion, 706 So.2d at 280 (quoting Governor Lawton Chiles' letter dated March 6, 1997). Thus, the need for the 1997 Advisory Opinion contemplated the issues that are now presented in the framework of the instant case.
Additionally, there is no express language in Amendment 5 creating for the petitioners a prohibition against being required to contribute for pollution abatement in the EPA or EAA. Although the 1997 Advisory Opinion stated that "the words `primarily responsible' require those in the EAA who cause water pollution in the EPA or EAA to bear the costs of abating that pollution," we further stated that the words "primarily responsible" would be applied within their ordinary meaning, which includes a recognition that individual polluters would not bear "the total burden." Id. at 283. The corollary to this is that other persons or entities continue to have responsibility for EPA or EAA pollution abatement. The lack of guiding principles in Amendment 5 concerning this division of responsibility is precisely why we held that legislative action was needed. See id. at 282.
Therefore, we again hold that the EFA remains in effect. Respondent's levy of 0.1 mill tax and other ad valorem taxes in conformity with the EFA is not unconstitutional as applied to petitioners. The decision of the district court of appeal is approved.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, and ANSTEAD, JJ., concur.
WELLS, C.J., concurs with an opinion.
LEWIS, J., concurs in result only.
PARIENTE, J., dissents with an opinion, in which QUINCE, J., concurs.
WELLS, C.J., concurring.
I concur with the majority decision that our decision in Advisory Opinion to the Governor1996 Amendment 5 (Everglades), 706 So.2d 278 (Fla.1997) (hereinafter 1997 Advisory Opinion), compels us to affirm the circuit court's ruling below.
I write to explain that I believe this decision is also consistent with the history of the amendment which resulted in article II, section 7(b) of the Florida Constitution. The majority's setting out in detail this Court's cases concerning the Everglades initiatives is helpful in putting article II, section 7(b), in proper context. What the *84 history shows is that this section was presented to this Court and to the voters as part of a comprehensive plan to establish a trust fund to be used for restoration and protection of the Everglades against pollution. The proponents of the initiatives intended that the trust fund be funded by a fee imposed on sugar growers in the Everglades Agricultural Area (EAA). The responsibility amendment was to lend support to the application of the fee to those who were doing the polluting. But, of course, what happened along the way was that the fee amendment was defeated while the other two amendments passed.
It must be noted that nothing in either the 1994 initiative, which was struck by this Court, or in the 1996 responsibility initiative, which was allowed by this Court to proceed, limited in any way or even referred to the ad valorem taxes which the South Florida Water Management District is authorized by the Constitution and general law to levy. To the contrary, this Court specifically stated that the responsibility initiative had a limited and focused objective, which was to have those who cause water pollution within the Everglades Protection Area (EPA) or the EAA pay the cost of the abatement of that pollution. See Advisory Opinion to Attorney Gen.Fee on Everglades Sugar Prod., 681 So.2d 1124, 1130 (Fla.1996). Fixing primary responsibility for these payments is not an express limitation on the government's power to levy a tax on property within the area.
In 1930, this Court stated, in Amos v. Mathews, 99 Fla. 1, 126 So. 308, 315 (1930), that "[t]he state therefore possesses, as an attribute of sovereignty, the inherent power to impose all taxes not expressly or by clear implication inhibited by State or Federal Constitutions." This is an important principle, and clearly the only way to reach the conclusion that article II, section 7(b), limits the levy of the ad valorem tax is to conclude that it does so by "implication," which our precedent would not support in this situation. See Amos, 126 So. at 315; see also In re Advisory Opinion to the Governor, 132 So.2d 163, 169 (Fla.1961) ("Implied repeals of statutes by later constitutional provisions is not favored and the courts require that in order to produce a repeal by implication the repugnancy between the statute and the Constitution must be obvious or necessary.").
Further, I would be very concerned about the effect that a judicially imposed limitation on the Everglades Forever Act's (EFA) 0.1 mill levy would have on the present restoration plan of the EFA. I recognize that the petitioners seek for this Court to declare that "the Everglades Construction Project ... be permitted to continue while the Legislature is granted `a reasonable period of time' to reallocate the relative contribution by innocent ad valorem taxpayers and EAA polluters" and, if the Legislature does not act by the conclusion of the next legislative session, that this Court should provide for that reallocation. However, I agree with the Fifth District that the courts have no authority to do this. See Barley v. South Florida Water Mgmt. Dist., 766 So.2d 433, 434 (Fla. 5th DCA 2000).
I do conclude that the Legislature is under a constitutional mandate to pass legislation implementing Amendment 5. In our 1997 Advisory Opinion, we noted this by stating that "the voters expected the legislature to enact supplementary legislation to make it effective, to carry out its intended purpose, and to define any rights intended to be determined, enjoyed, or protected." 1997 Advisory Opinion, 706 So.2d at 282. I urge the Legislature to carry out the will of the voters.
*85 PARIENTE, J., dissenting.
Although I agree with the majority that the enactment of article VII, section 9, of the Florida Constitution did not render the EFA unconstitutional on its face, I would quash the Fifth District's decision because I conclude that the portion of the declaratory judgment action seeking a determination that the EFA is unconstitutional as applied would not be prohibited.[6] Thus, I agree with Judge Harris's dissenting opinion that the amendment represents a clear mandate from the citizens of our State protecting non-polluters within the EAA and EPA from paying polluters' clean-up costs. See Barley v. South Florida Mgmt. Dist., 766 So.2d 433, 435-36 (Fla. 5th DCA 2000) (Harris, J., dissenting). As Judge Harris explained:
Appellants argue that even though the legislature has failed to enact legislation defining water pollution and determining what constitutes a polluter and hence may not be in a position to carry out the mandate of the amendment by making the polluters pay, this does not affect their rights as non-polluters, also granted by the amendment, not to pay any of the costs of abating pollution caused by others since the amendment. This portion of the amendment, they urge, is self executing. No legislative action is necessary to implement the constitutional right to be free from paying a tax to abate others' pollution. This is a current, organic right granted by the people. I agree. The legislature cannot by inaction repeal the will of the people.
Id. (footnote omitted).
In fact, in defining the phrase "primarily responsible" as used in the amendment, we concluded in Advisory Opinion to the Governor, 706 So.2d 278, 283 (Fla.1997), that the phrase "require[s] those in the EAA who cause water pollution in the EPA or EAA to bear the costs of abating that pollution." (Emphasis supplied.) If non-polluters in the EPA or EAA are paying for the costs of the abatement of water pollution within the EPA and the EAA, this would violate the clear language of the amendment. No additional legislation is necessary to effectuate non-polluters' rights to be free from the clean-up costs associated with polluters-as opposed to the necessity for legislation to ensure that polluters pay the cost of the abatement of water pollution that they cause. Thus, I conclude that this constitutional amendment vests certain rights that can be enforced through a declaratory judgment action. Accordingly, I would quash the Fifth District's decision.
QUINCE, J., concurs.
NOTES
[1] Article II, section 7(b) provides:

Those in the Everglades Agricultural Area who cause water pollution within the Everglades Protection Area or the Everglades Agricultural Area shall be primarily responsible for paying the costs of the abatement of that pollution. For purposes of this subsection, the terms "Everglades Protection Area" and "Everglades Agricultural Area" shall have the meanings as defined in statutes in effect on January 1, 1996.
[2] The full text of the citizens' initiative provided:

(a) The people of Florida believe that protecting the Everglades Ecosystem helps assure clean water and a healthy economy for future generations. The sugarcane industry in the Everglades Ecosystem has profited while damaging the Everglades with pollution and by altering the water supply. Therefore, the sugarcane industry should help pay to clean up the pollution and to restore clean water. To that end, the people hereby establish a Trust, controlled by Florida citizens, dedicated to restoring the Everglades Ecosystem, and funded initially by a fee on raw sugar from sugarcane grown in the Everglades Ecosystem.
(b) Article X, Florida Constitution, is hereby amended to add the following:
Section 16. Save Our Everglades Trust Fund.
(a) There is established the Save Our Everglades Trust Fund (Trust). The sole purpose of the Trust is to expend funds to recreate the historical ecological functions of the Everglades Ecosystem by restoring water quality, quantity, timing and distribution (including pollution clean up and control, exotic species removal and control, land acquisition, restoration and management, construction and operation of water storage and delivery systems, research and monitoring).
(b) The Trust shall be administered by five Trustees. Trustees shall be appointed by the governor, subject to confirmation by the Senate, within thirty days of a vacancy. Trustees' appointments shall be for five years; provided that the terms of the first Trustees appointed may be less than five years so that each Trustee's term will end during a different year. Trustees shall be residents of Florida with experience in environmental protection, but Trustees shall not hold elected governmental office during service as a Trustee. Trustees may adopt their own operating rules and regulations, subject to generally-applicable law. Disputes arising under this Section shall be first brought to a hearing before the Trustees, and thereafter according to generally-applicable law. Trustees shall serve without compensation but may be reimbursed for expenses.
(c) The Trust shall be funded by revenues which shall be collected by the State and deposited into the Trust, all of which funds shall be appropriated by the Legislature to the Trustees to be expended solely for the purpose of the Trust. Revenues collected by the State shall come from a fee on raw sugar from sugarcane grown within the Everglades Ecosystem. The fee shall be assessed against each first processor of sugarcane at the rate of $.01 per pound of raw sugar, increased annually by any inflation measured by the Consumer Price Index for all urban consumers (U.S. City Average, All Items), or successor reports of the United States Department of Labor, Bureau of Labor Statistics or its successor, and shall expire twenty-five years after the effective date of this Section.
(d) For purposes of this Section, the Everglades Ecosystem is defined as Lake Okeechobee, the historical Everglades watershed west, south and east of Lake Okeechobee, Florida Bay and the Florida Keys Coral Reef, provided that the Trustees may refine this definition.
(e) Implementing legislation is not required for this Section, but nothing shall prohibit the establishment by law or otherwise of other measures designed to protect or restore the Everglades. If any portion of this Section is held invalid for any reason, the remaining portion of this Section shall be severed from the void portion and given the fullest possible force and application. This Section shall take effect on the day after approval by the electors.
[3] The other two initiative petition cases were styled Advisory Opinion to the Attorney General Everglades Trust Fund and Advisory Opinion to the Attorney General Responsibility for Paying Costs of Water Pollution Abatement in the Everglades. The full text of the Fee on Everglades Sugar Production initiative provided:

(a) Article VII, Section 9 is amended by a new subsection(c) at the end thereof, to read:
(c) The South Florida Water Management District, or its successor agency, shall levy a fee, to be called the Everglades Sugar Fee, of one cent per pound of raw sugar, assessed against each first processor, from sugarcane grown in the Everglades Agricultural Area. The Everglades Sugar Fee is imposed to raise funds to be used, consistent with statutory law, for purposes of conservation and protection of natural resources and abatement of water pollution in the Everglades Protection Area and Everglades Agricultural Area, pursuant to the policy of the state in Article II, Section 7.
(2) The Everglades Sugar Fee shall expire twenty-five years from the effective date of this subsection.
(3) For purposes of this subsection, the terms "South Florida Water Management District," "Everglades Agricultural Area," and "Everglades Protection Area" shall have the meanings as defined in statutes in effect on January 1, 1996.
(b) This subsection shall take effect on the day after approval by the electors. If any portion or application of this measure is held invalid for any reason, the remaining portion or application, to the fullest extent possible, shall be severed from the void portion and given the fullest possible force and application.
The full text of the Everglades Trust Fund initiative provided:
(a) Article X is amended by adding a new section 17 at the end thereof, to read:
SECTION 17, Everglades Trust Fund.
(a) There is hereby established the Everglades Trust Fund, which shall not be subject to termination pursuant to Article II, Section 19(f). The purpose of the Everglades Trust Fund is to make funds available to assist in conservation and protection of natural resources and abatement of water pollution in the Everglades Protection Area and the Everglades Agricultural Area. The trust fund shall be administered by the South Florida Water Management District or its successor agency, consistent with statutory law.
(b) The Everglades Trust Fund may receive funds from any source, including gifts from individuals, corporations or other entities, funds from general revenue as determined by the Legislature; and any other funds so designated by the Legislature, by the United States Congress or by any other governmental entity.
(c) Funds deposited to the Everglades Trust Fund shall be expended for purposes of conservation and protection of natural resources and abatement of water pollution in the Everglades Protection Area and Everglades Agricultural Area.
(d) For purposes of this subsection, the terms "Everglades Protection Area", "Everglades Agricultural Area" and "South Florida Water Management District" shall have the meanings as defined in statutes in effect on January 1, 1996.
(b) If any portion or application of this measure is held invalid for any reason, the remaining portion or application, to the fullest extent possible, shall be severed from the void portion and given the fullest possible force and effect.
The full text of the Responsibility for Paying Costs of Water Pollution Abatement in the Everglades initiative provided:
(a) The Constitution currently provides, in Article II, Section 7, the authority for the abatement of water pollution. It is the intent of this amendment that those who cause water pollution within the Everglades Agricultural Area or the Everglades Protection Area shall be primarily responsible for paying the costs of abatement of that pollution.
(b) Article II, Section 7 is amended by inserting (a) immediately before the current text, and adding a new subsection (b) at the end thereof, to read:
(b) Those in the Everglades Agricultural Area who cause water pollution within the Everglades Protection Area or the Everglades Agricultural Area shall be primarily responsible for paying the costs of the abatement of that pollution. For the purposes of this subsection, the terms "Everglades Protection Area" and "Everglades Agricultural Area" shall have the meanings as defined in statutes in effect on January 1, 1996.
[4] Counsel who appear on behalf of petitioners in this case appeared on behalf of Save Our Everglades, Inc., an interested party in the 1996 case.
[5] Petitioners' argument in this regard is similar to the opinion set forth by Judge Harris in his dissent. See Barley v. South Florida Water Mgmt. Dist., 766 So.2d 433, 434 (Fla. 5th DCA 2000) (Harris, J., dissenting).
[6] For example, the petitioners' prayer for relief included the following:

2. Declaring that the 0.1 mill ad valorem tax levied by the SFWMD pursuant to section 373.4592(4)(a), Florida Statutes (1994) of the EFA to abate EAA pollution and the additional ad valorem taxes levied under the SFWMD's general ad valorem taxing authority for other pollution abatement costs attributable to EAA polluters, violate the Polluter Pays Amendment as applied to the Plaintiffs and other ad valorem taxpayers within the Okeechobee Basin because the polluters within the EAA as a group are not presently not paying for 100% of the costs to abate the pollution they cause, thereby resulting in non-EAA ad valorem taxpayers paying a significant portion of the EAA polluters' clean-up costs.