636 So.2d 1336 (1994)
In re ADVISORY OPINION TO THE ATTORNEY GENERAL  SAVE OUR EVERGLADES.
No. 83301.
Supreme Court of Florida.
May 26, 1994.
*1337 Robert A. Butterworth, Atty. Gen. and Louis F. Hubener, III, Asst. Atty. Gen., Tallahassee, Jon L. Mills and Fletcher N. Baldwin, Jr., Gainesville, for Save Our Everglades Committee.
W. Dexter Douglass and Gary L. Printy of Douglass, Powell & Rudolph, Tallahassee, for Florida Audubon Society, in support of petitioner.
Cecilia F. Renn, Vice President and General Counsel, and Julian Clarkson and Susan L. Turner of Holland & Knight, Tallahassee, for Associated Industries of Florida, opposing proposed amendment.
Howell L. Ferguson of Landers & Parsons, Tallahassee, Bruce S. Rogow and Beverly A. Pohl, Ft. Lauderdale, and William B. Killian of Steel, Hector & Davis, Miami, for Flo-Sun, Inc., opposing proposed amendment.
Stanley James Brainerd and Kenneth R. Hart and R. Stan Peeler of MacFarlane, Ausley, Ferguson & McMullen, Tallahassee, for Florida Chamber of Commerce, opposing proposed amendment.
Terry Cole and Timothy P. Atkinson of Oertel, Hoffman, Fernandez & Cole, P.A., Tallahassee, for Florida Fruit and Vegetable Ass'n, opposing proposed amendment.
Joseph W. Little, Gainesville, and Judith S. Kavanaugh of Earl, Blank, Kavanaugh & Stotts, P.A., for The Florida Sugar Cane League, Inc., opposing proposed amendment.
Robert P. Smith of Hopping, Boyd, Green & Sams, Tallahassee, for Sugar Cane Growers Co-op of Florida, Inc., opposing proposed amendment.
Cass D. Vickers, Robert S. Goldman and Thomas M. Findley of Messer, Vickers, Caparello, Madsen, Lewis, Goldman & Metz, P.A., Tallahassee, for U.S. Sugar Corp., opposing proposed amendment.
Arthur J. England, Jr., Barry S. Richard and Christopher L. Kurzner of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, for Florida Farmers for Fairness Committee, opposing proposed amendment.
SHAW, Justice.
The Attorney General has requested this Court to review a proposed amendment to the Florida Constitution. We have jurisdiction. Art. IV, § 10; art. V, § 3(b)(10), Fla. Const. We find the proposed amendment defective and order it stricken from the ballot.

I. FACTS
The Florida Attorney General has petitioned this Court for an advisory opinion on the validity of an initiative petition circulated pursuant to article XI, section 3, Florida Constitution, by a group known as Save Our Everglades Committee. See Art. IV, § 10, Fla. Const.; § 16.061, Fla. Stat. (1993). The petition seeks to amend the Florida Constitution by creating a trust to restore the Everglades funded by a fee on raw sugar. The full text of the petition reads as follows:

*1338 TITLE: SAVE OUR EVERGLADES
SUMMARY: Creates the Save Our Everglades Trust to restore the Everglades for future generations. Directs the sugarcane industry, which polluted the Everglades, to help pay to clean up pollution and restore clean water supply. Funds the Trust for twenty-five years with a fee on raw sugar from sugarcane grown in the Everglades Ecosystem of one cent per pound, indexed for inflation. Florida citizen trustees will control the Trust.
FULL TEXT OF PROPOSED AMENDMENT:
(a) The people of Florida believe that protecting the Everglades Ecosystem helps assure clean water and a healthy economy for future generations. The sugarcane industry in the Everglades Ecosystem has profited while damaging the Everglades with pollution and by altering the water supply. Therefore, the sugarcane industry should help pay to clean up the pollution and to restore clean water. To that end, the people hereby establish a Trust, controlled by Florida citizens, dedicated to restoring the Everglades Ecosystem, and funded initially by a fee on raw sugar from sugarcane grown in the Everglades Ecosystem.
(b) Article X, Florida Constitution, is hereby amended to add the following:
"Section 16. Save Our Everglades Trust Fund.
"(a) There is established the Save Our Everglades Trust Fund (Trust). The sole purpose of the Trust is to expend funds to recreate the historical ecological functions of the Everglades Ecosystem by restoring water quality, quantity, timing and distribution (including pollution clean up and control, exotic species removal and control, land acquisition, restoration and management, construction and operation of water storage and delivery systems, research and monitoring).
"(b) The Trust shall be administered by five Trustees. Trustees shall be appointed by the governor, subject to confirmation by the Senate, within thirty days of a vacancy. Trustees' appointments shall be for five years; provided that the terms of the first Trustees appointed may be less than five years so that each Trustee's term will end during a different year. Trustees shall be residents of Florida with experience in environmental protection, but Trustees shall not hold elected governmental office during service as a Trustee. Trustees may adopt their own operating rules and regulations, subject to generally-applicable law. Disputes arising under this Section shall be first brought to a hearing before the Trustees, and thereafter according to generally-applicable law. Trustees shall serve without compensation but may be reimbursed for expenses.
"(c) The Trust shall be funded by revenues which shall be collected by the State and deposited into the Trust, all of which funds shall be appropriated by the Legislature to the Trustees to be expended solely for the purpose of the Trust. Revenues collected by the State shall come from a fee on raw sugar from sugarcane grown within the Everglades Ecosystem. The fee shall be assessed against each first processor of sugarcane at the rate of $.01 per pound of raw sugar, increased annually by any inflation measured by the Consumer Price Index for all urban consumers (U.S. City Average, All Items), or successor reports of the United States Department of Labor, Bureau of Labor Statistics or its successor, and shall expire twenty-five years after the effective date of this Section.
"(d) For purposes of this Section, the Everglades Ecosystem is defined as Lake Okeechobee, the historical Everglades watershed west, south and east of Lake Okeechobee, Florida Bay and the Florida Keys Coral Reef, provided that the Trustees may refine this definition.
"(e) Implementing legislation is not required for this Section, but nothing shall prohibit the establishment by law or otherwise of other measures designed to protect or restore the Everglades. If any portion of this Section is held invalid for any reason, the remaining portion of this Section shall be severed from the void portion and given the fullest possible force and application. *1339 This Section shall take effect on the day after approval by the electors."
Our analysis of this proposed amendment is limited to two inquiries: whether the amendment addresses but a single subject, and whether the amendment's title and summary are sufficiently clear.

II. SINGLE SUBJECT
Article XI, section 3, Florida Constitution, provides in relevant part:
The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that any such revision or amendment shall embrace but one subject and matter directly connected therewith.
This single-subject provision is a rule of restraint designed to insulate Florida's organic law from precipitous and cataclysmic change.
We described the context in which the single-subject rule operates in Fine v. Firestone, 448 So.2d 984 (Fla. 1984):
The single-subject requirement in the proviso language of this section is a rule of restraint. It was placed in the constitution by the people to allow citizens, by initiative petition, to propose and vote on singular changes in the functions of our governmental structure. The initiative petition is one of four methods authorized for amending or revising the state constitution.
Article XI of the Florida Constitution, in sections 1-4, prescribes the procedures for amending or revising the constitution. Section 1 authorizes the legislature, by joint resolution passed by a three-fifths vote of the membership of each house of the legislature, to propose an amendment of a section or revision of one or more articles, or the whole, of the constitution. Section 2 authorizes a revision commission to meet at specific intervals and present to the electorate a revision of the constitution. Section 4 authorizes the establishment of a constitutional convention which may present to the electorate a revision of the constitution. Only the initiative process in section 3 contains the restrictive language that "any such revision or amendment shall embrace but one subject and matter directly connected therewith."
It is apparent that the authors of article XI realized that the initiative method did not provide a filtering legislative process for the drafting of any specific proposed constitutional amendment or revision. The legislative, revision commission, and constitutional convention processes of sections 1, 2 and 4 all afford an opportunity for public hearing and debate not only on the proposal itself but also in the drafting of any constitutional proposal. That opportunity for input in the drafting of a proposal is not present under the initiative process and this is one of the reasons the initiative process is restricted to single-subject changes in the state constitution. The single-subject requirement in article XI, section 3, mandates that the electorate's attention be directed to a change regarding one specific subject of government to protect against multiple precipitous changes in our state constitution.
Id. at 988.
The single-subject limitation also guards against "logrolling," a practice wherein several separate issues are rolled into a single initiative in order to aggregate votes or secure approval of an otherwise unpopular issue. This Court described one such petition:
The proposal is offered as a single amendment but it obviously is multifarious. It does not give the people an opportunity to express the approval or disapproval severally as to each major change suggested; rather does it, apparently, have the purpose of aggregating for the measure the favorable votes from electors of many suasions who, wanting strongly enough any one or more propositions offered, might grasp at that which they want, tacitly accepting the remainder. Minorities favoring each proposition severally might, thus aggregated, adopt all.
Adams v. Gunter, 238 So.2d 824, 831 (Fla. 1970) (quoting McFadden v. Jordan, 32 Cal.2d 330, 196 P.2d 787, 796-97 (1948)).
This Court utilizes a "oneness of purpose" standard in applying the single-subject rule. Fine, 448 So.2d at 990 ("the *1340 one-subject limitation deal[s] with a logical and natural oneness of purpose"). This standard in turn incorporates a functional test:
[T]he test should include a determination of whether the proposal affects a function of government as opposed to whether the proposal affects a section of the constitution... . [T]he one-subject limitation... was selected to place a functional as opposed to a locational restraint on the range of authorized amendments.
Fine, 448 So.2d at 990. Although a proposal may affect several branches of government and still pass muster,[1] no single proposal can substantially alter or perform the functions of multiple branches:
The test ... is functional and not locational, and where a proposed amendment changes more than one government function it is clearly multi-subject.... We recognize that all power for each branch of government comes from the people and that the citizens of the state have retained the right to broaden or to restrict that power by initiative amendment. But where such an initiative performs the functions of different branches of government, it clearly fails the functional test for the single-subject limitation the people have incorporated into article XI, section 3, Florida Constitution.
Evans v. Firestone, 457 So.2d 1351, 1354 (Fla. 1984).
We conclude that the present initiative performs the functions of multiple branches of government. Section (b) of the initiative establishes a trust for restoration of the Everglades and provides for funding and operation of the trust. This provision implements a public policy decision of statewide significance and thus performs an essentially legislative function. The initiative also imposes a levy  whether characterized as a fee or a tax  on raw sugar, and gives the trustees complete autonomy in deciding how revenues are to be spent. Because of the imprecise description of the Everglades Ecosystem, the trustees would be required to set the boundaries within which the fee can be levied, and are authorized to redefine these boundaries. The exercise of these traditionally legislative functions is not even subject to the constitutional check of executive branch veto.
The initiative also contemplates the exercise of vast executive powers. The trustees are authorized to "administer" the trust, expending funds to restore water quantity and quality to levels that existed at some earlier, unspecified, "historical" date. They are entrusted with the power to expend trust funds in "pollution cleanup and control" efforts, and thus would be required to identify offending pollutants and sources of pollution and take corrective measures. By virtue of their "management, construction, and operation of water storage and sewer systems," they would be building and operating stormwater treatment areas, canals, pumping stations, and other facilities with state funds. Because various other executive agencies have jurisdiction in this area, the constitutionally conferred powers of the trustees would impinge on the powers of existing agencies. Furthermore, the initiative authorizes the trustees to expend trust funds in acquiring lands and gives them rulemaking authority.
Finally, the initiative performs a judicial function. Section (a) finds that the sugar cane industry polluted the Everglades and imposes a flat fee on that industry to cover cleanup costs. This provision renders a judgment of wrongdoing and de facto liability and thus performs a quintessential judicial function. It is as though the drafters drew up their plan to restore the Everglades, then stepped outside their role as planners, donned judicial robes, and made factual findings and determinations of liability and damages.
Thus, the initiative performs functions of each branch of government. Viewed in its entirety, the initiative creates a virtual fourth branch of government with authority to exercise the powers of the other three on the subject of remedying Everglades pollution. The initiative falls far short of meeting the *1341 single-subject requirement of article XI, section 3 of the Florida Constitution.[2]
We note that the initiative embodies precisely the sort of logrolling that the single-subject rule was designed to foreclose. There is no "oneness of purpose," but rather a duality of purposes. One objective  to restore the Everglades  is politically fashionable, while the other  to compel the sugar industry to fund the restoration  is more problematic. Many voters sympathetic to restoring the Everglades might be antithetical to forcing the sugar industry to pay for the cleanup by itself, and yet those voters would be compelled to choose all or nothing. The danger is that our organic law might be amended to compel the sugar industry to pay for the cleanup singlehandedly even though a majority of voters do not think this wise or fair.

III. TITLE AND SUMMARY
Section 101.161, Florida Statutes (1993), lists the requirements for the ballot title and summary of a proposed constitutional amendment:
Whenever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot... . The wording of the substance of the amendment or other public measure and the ballot title to appear on the ballot shall be embodied in the [proposal]... . The substance of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure. The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.
§ 101.161(1), Fla. Stat. (1993).
"[S]ection 101.161 requires that the ballot title and summary for a proposed constitutional amendment state in clear and unambiguous language the chief purpose of the measure." Askew v. Firestone, 421 So.2d 151, 154-55 (Fla. 1982). This is so that the voter will have notice of the issue contained in the amendment, will not be misled as to its purpose, and can cast an intelligent and informed ballot. Id. at 155. However, "[i]t is not necessary to explain every ramification of a proposed amendment, only the chief purpose." Carroll v. Firestone, 497 So.2d 1204, 1206 (Fla. 1986).
The title of the present initiative  "SAVE OUR EVERGLADES"  is misleading. It implies that the Everglades is lost, or in danger of being lost, to the citizens of our State, and needs to be "saved" via the proposed amendment. Yet, nothing in the text of the proposed amendment hints at this peril. Section (a) avers only that the Everglades was polluted at some point in the past by the sugarcane industry. The severity of pollution is unmentioned  it could be extensive, or relatively minor. Further, the text of the amendment clearly states that the purpose of the amendment is to "restore" the Everglades to its original condition, not to "save" it from peril. A voter responding to the emotional language of the title could well be misled as to the contents and purpose of the proposed amendment. "A proposed amendment cannot fly under false colors; this one does." Askew v. Firestone, 421 So.2d at 156.
The summary too is misleading. It provides that the sugarcane industry, "which polluted the Everglades," is "to help to pay to clean up pollution." By using the phrase "to help to pay," the summary gives the reader the impression that entities other than the sugarcane industry will be sharing the expense of cleanup. Yet, nothing in the text of the proposed amendment indicates that this would be the case. The text implies just the opposite  it calls for the levying of a fee on the first processors of sugarcane exclusively. A voter perusing the summary could well be misled on this material point.
*1342 Finally, the summary more closely resembles political rhetoric than it does an accurate and informative synopsis of the meaning and effect of the proposed amendment. As this Court stated in Evans:
[T]he ballot summary is no place for subjective evaluation of special impact. The ballot summary should tell the voter the legal effect of the amendment and no more. The political motivation behind a given change must be propounded outside the voting booth.
Evans, 457 So.2d at 1355.

IV. CONCLUSION
Based on the foregoing, we conclude that the title, summary, and text of the proposed amendment violate the legal requirements of article XI, section 3, Florida Constitution, and section 101.161, Florida Statutes (1993), and must be stricken from the ballot.
It is so ordered.
GRIMES, C.J., OVERTON, KOGAN and HARDING, JJ., and McDONALD, Senior Justice, concur.
NOTES
[1] See Advisory Opinion to the Attorney General  Limited Political Terms in Certain Elective Offices, 592 So.2d 225, 227 (Fla. 1991) ("We have found proposed amendments to meet the single-subject requirement even though they affected multiple branches of government.").
[2] The proponents' argument that the present proposal is no more violative of the single-subject rule than was the amendment creating the Game and Fresh Water Fish Commission (GFWFC) is without merit. See art. IV, § 9, Fla. Const. The amendment creating the GFWFC was proposed by joint resolution of the legislature and thus was not subject to the single-subject rule. Compare art. XI, § 1, Fla. Const. (no single-subject requirement) with art. XI, § 3, Fla. Const. (single-subject requirement). See generally Fine, 448 So.2d at 988.