PER CURIAM.
The Attorney General has petitioned this Court seeking an advisory opinion regarding the validity of a proposed amendment to the Florida Constitution submitted by an organization that has taken the name Floridians for Patient Protection. We have jurisdiction. See art. IV, § 10; art. V, § 3(b)(10), Fla. Const.
The full text of the proposed amendment reads as follows:
(1) Statement and Purpose:
*660 Many physicians in Florida agree to accept fees for health care covered by health insurance plans or other governmental or private third-party payor programs which limit payments for particular medical treatments, services or procedures. Yet many Floridians, including those in Health Maintenance Organizations or other “managed-care” programs and those without any coverage at all, pay substantially-higher fees for the same medical services. The purpose of this amendment is to insure that all Floridians are able to obtain the lowest prices for medical services which doctors will accept. Doctors will remain free to set their own fees, or to agree to any charges or fee schedules from third-party payors, subject to general law, but they can no longer charge some Floridians more for the same services just because the patients are not in the lowest-cost health insurance plan. In order to help consumers protect themselves against over-charges, patients and their representatives are to be given access, upon request, to the fee data necessary to determine whether they are receiving the lowest agreed-upon fee or whether this amendment is otherwise being violated.
(2) Amendment of Florida Constitution: Art. X, Fla. Const., is amended by adding the following section at the end thereof, to read:
“Section 22. Physicians’ Health Care Charges.[1]
(a)A physician shall charge all purchasers the lowest fee for health care which the physician has agreed to accept as full payment for the same health care when the same health care is being paid for in whole or in part through any agreement between the physician and any other purchaser. Nothing in this section shall be deemed to limit the physician’s right to provide any health care for free.
(b) To assist patients to determine a physician’s fees and compliance with this Section, a patient shall have access to any fee schedules agreed to by the physician, and any other records of the physician related to the patient’s health care which might contain information indicating whether the physician is in compliance with this Section. This right of access, whether or not exercised, may not be waived, and may be exercised prior to, during or after the health care is provided. This right of access is not intended to conflict with, supercede or alter any rights or obligations under general law related to the privacy of patient records.
(c) Definitions. As used in this section, the following terms shall have the following meanings:
(i) “Health care” means services, procedures, treatment, accommodations or products provided by a physician described by this section.
(ii) “Physician” means one licensed pursuant to Chapter 458, Florida Statutes, or any similar successor statute, and any corporation, professional association or similar organization established and operated for the purpose of providing health care by such licensees.
(iii) “Purchaser” means patients, third-party payors or others paying for a patient’s health care, and does *661 not include a patient receiving care without charge.
(iv) “Charge” means require, charge, bill, accept or be entitled to receive as payment for health care.
(v) “Patient” means an individual who has sought, is seeking, is receiving, or has received health care from the physician.
(vi) “Have access to” means, in addition to any other procedure for producing such records provided by general law, making the records available for review, inspection and copying upon formal or informal request by the patient or a representative of the patient, provided that current records which have been made publicly available by publication or on the Internet may be made available by reference to the location at which the records are publicly available.”
(3) Effective Date and Severability:
This amendment shall be effective on the date it is approved by the electorate, and shall apply to any health care payment agreement entered into or renewed after the effective date. If any portion of this measure is held invalid for any reason, the remaining portion of this measure, to the fullest extent possible, shall be severed from the void portion and given the fullest possible force and application.
The ballot title for the proposed amendment is “Physician Shall Charge the Same Fee for the Same Health Care Service to Every Patient.” The summary for the proposed amendment provides:
Current law allows a physician to charge different prices for the same health care provided to different patients. This amendment would require a physician to charge the same fee for the same health care service, procedure or treatment. Requires lowest fee which physician has agreed to accept. Doesn’t limit physician’s ability to provide free services. A patient may review the physician’s fee and similar information before, during or after the health care is provided.
We have previously explained our standard of review in connection with petitions seeking advisory opinions of this nature:
In determining the validity' of initiative petitions, this Court’s inquiry is limited to two legal issues: whether the proposed amendment comports with the single-subject requirement of article XI, section 3 of Florida’s Constitution, and whether the ballot title and summary are clear and unambiguous pursuant to section 101.161(1), Florida Statutes (1999). This Court’s review of a proposed amendment is strictly limited to these legal issues and does not include an evaluation of the merits or the wisdom of the proposed amendment. Accordingly, we do not have the authority to evaluate whether ... the subject matter of this proposed amendment should more appropriately be addressed by the Legislature.
Advisory Op. to the Att’y Gen. re Fla. Transp. Initiative for Statewide High Speed Monorail, Fixed Guideway or Magnetic Levitation Sys., 769 So.2d 367, 368-69 (Fla.2000) (citations omitted).[2]
SINGLE-SUBJECT REQUIREMENT
Article XI, section 3, of the Florida Constitution provides, in pertinent part:
The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved *662 to the people, provided that, any such revision or amendment, except for those limiting the power of government to raise revenue, shall embrace but one subject and matter directly connected therewith.
This Court has recognized that the single-subject requirement protects against “multiple precipitous changes in our state constitution.” Fine v. Firestone, 448 So.2d 984, 988 (Fla.1984). The requirement is “intended to direct the electorate’s attention to one change which may affect only one subject and matters directly connected therewith.” Id. at 989. There is a dual purpose for the requirement. First, the single-subject requirement prevents “logrolling,” the “practice whereby an amendment is proposed which contains unrelated provisions, some of which electors might wish to support, in order to get an otherwise disfavored provision passed.” Advisory Op. to the Att’y Gen. re Ltd. Casinos, 644 So.2d 71, 73 (Fla.1994). The second justification for the single-subject requirement is that it is directed to prevent a single constitutional amendment from substantially altering or performing the functions of multiple aspects of government. See Advisory Op. to the Att’y Gen. re Fla. Transp. Initiative, 769 So.2d at 369. The requirement “protects against multiple ‘precipitous’ and ‘cataclysmic’ changes in the constitution by limiting to a single subject what may be included in any one amendment proposal.” Advisory Op. to the Att’y Gen. re Fish & Wildlife Conservation Comm’n, 705 So.2d 1351, 1353 (Fla.1998) (quoting In re Advisory Op. to the Att’y Gen. — Save Our Everglades, 636 So.2d 1336, 1339 (Fla.1994)).
We have repeatedly held that “in determining whether a proposal addresses a single subject the test is whether it ‘may be logically viewed as having a natural relation and connection as component parts or aspects of a single dominant plan or scheme. Unity of object and plan is the universal test....’ ” Fine, 448 So.2d at 990 (quoting City of Coral Gables v. Gray, 154 Fla. 881, 19 So.2d 318, 320 (1944)); see also Advisory Op. to the Att’y Gen. re Fla. Transp. Initiative, 769 So.2d at 369; Advisory Op. to the Att’y Gen. re Ltd. Casinos, 644 So.2d at 73. The amendment must have a “natural oneness of purpose.” Fine, 448 So.2d at 990.
The only subject embraced within the proposed constitutional amendment at issue here is clearly the requirement that physicians charge the same fee or amount for health care services for all patients, regardless of whether the fee for such care is being paid by the patient directly or through an agreement between the physician and a third-party payor, including health insurance plans. As explained by the amendment’s sponsor, there is a simple purpose behind the amendment — to eliminate cost shifting by giving or providing discounts, without public disclosure, to select groups that pay for health care services. Section (b) of the amendment, regarding a patient’s right to access a physician’s fee schedule to insure compliance with the amendment, is not a separate subject. The instant action is not unlike the amendment presented in Advisory Opinion to the Attorney General re Limited Casinos. There, the amendment authorized a limited number of gaming casinos in various counties in Florida. See Advisory Op. to the Att’y Gen. re Ltd. Casinos, 644 So.2d at 72. A separate section of the amendment provided that the Legislature would implement the amendment by passing legislation to regulate, tax, and license the casinos. See id. at 73. This Court held that the section pertaining to the legislative implementation was “incidental and reasonably necessary to effectuate the purpose of the proposed amendment and [did] not violate the sin *663 gle-subject requirement.” Id. at 74. Similarly, here, the provision allowing patients access to a physician’s fee schedule is reasonably necessary to effectuate the purpose of the amendment. Without access to fee schedules, it would be impossible for a patient to determine whether a physician is adhering to the mandates of the amendment.
The sponsor of the amendment argues that the proposed amendment does not substantially affect other sections of the constitution. We agree. The Florida Constitution does not currently contain a provision related to the fees that may be charged by physicians, and the right of privacy is not impacted. Article I, section 23, of the Florida Constitution provides: “Every natural person has the right to be let alone and free from governmental intrusion into the person’s private life except as otherwise provided herein. This section shall not be construed to limit the public’s right of access to public records and meetings as provided by law.” Art. I, § 23, Fla. Const. Pursuant to Florida law, executive agencies already have access to physician fee schedules and payment information. See § 408.061, Fla. Stat. (2003).[3] Therefore, the right of privacy is not affected by the proposed amendment’s disclosure requirement, as fee schedules are public records and are obtained by government agencies.
Florida’s contractual clause, article I, section 10 of the state constitution, provides: “No bill of attainder, ex post facto law or law impairing the obligation of contracts shall be passed.” Art. I, § 10, Fla. Const. This provision applies only to existing contracts. See Manning v. Travelers Ins. Co., 250 So.2d 872, 874 (Fla.1971) (“The guaranty of liberty of contract was never intended to withdraw from legislative supervision the making of contracts or deny to the government the power to provide restrictive safeguards.”). The proposed amendment will require physicians to charge the same fee to all patients, regardless of how the fee is being paid, thus requiring that any contract fee with a third-party payor for a discounted fee previously below that paid by uninsured patients be available to all patients without regard to the source of payment. However, as noted by the sponsor, the amendment does not seek to alter existing contracts; it will only apply to fee agreements entered into following the enactment of the amendment. Therefore, as the proposed amendment does not affect existing contracts, it does not impact pre-existing rights under contract.
TITLE AND SUMMARY
Section 101.161(1), Florida Statutes (2003) provides, in pertinent part:
Whenever a constitutional amendment ... is submitted to the vote of the people, the substance of such amendment ... shall be printed in clear and unam *664 biguous language on the ballot after the list of candidates, followed by the word “yes” and also by the word “no,” and shall be styled in such a manner that a “yes” vote will indicate approval of the proposal and a “no” vote will indicate rejection.... [T]he substance of the amendment ... shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure .... The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.
§ 101.161(1), Fla. Stat. (2003). Pursuant to section 101.161(1), the ballot title and summary must accurately inform the voter of the chief purpose of the proposed amendment; however, they are not required to include all possible effects of the amendment, nor are they required to “explain in detail what the proponents hope to accomplish.” In re Advisory Op. to the Att’y Gen. English — The Official Language of Fla., 520 So.2d 11, 13 (Fla.1988); see also Advisory Op. to the Att’y Gen. re Tax Limitation, 673 So.2d 864, 868 (Fla.1996); In re Advisory Op. to the Att’y Gen. — Restricts Laws Related to Discrimination, 632 So.2d 1018, 1021 (Fla.1994). We have recognized that the seventy-five word limit on ballot summaries prevents the summary from revealing all details or all possible ramifications of the proposed amendment. See Advisory Op. to the Att’y Gen. re Amendment to Bar Gov’t from Treating People Differently Based on Race in Pub. Educ., 778 So.2d 888, 892 (Fla.2000); Smith v. American Airlines, 606 So.2d 618, 621 (Fla.1992). With respect to the ballot summary, we have explained: “[T]he voter should not be misled and ... [should] have an opportunity to know and be on notice as to the proposition on which he is to cast his vote.” Askew v. Firestone, 421 So.2d 151, 155 (Fla.1982) (quoting Hill v. Milander, 72 So.2d 796, 798 (Fla.1954)). Additionally, we have repeatedly held that we will not prohibit the vote unless “the summary is clearly and conclusively defective.” Florida League of Cities v. Smith, 607 So.2d 397, 399 (Fla.1992); see also Advisory Op. to the Att’y Gen. re Tax Limitation, 673 So.2d at 867.
The ballot title and summary of the proposed amendment here are clear, the language is not misleading or ambiguous, and the title and summary adequately inform the voters of the purpose of the proposed amendment. Furthermore, as noted above, the proposed constitutional amendment does not impact any other provision of the Florida Constitution and, therefore, it is not necessary that the summary inform voters of any conflict or impact with an existing provision. See Advisory Op. to the Attorney Gen. — Ltd. Political Terms in Certain Elective Offices, 592 So.2d 225, 228 (Fla.1991) (explaining that proposed amendment, in effect, “writes on a clean slate” and, therefore, does not present a situation in which the ballot summary conceals a conflict with an existing provision).
Given the seventy-five word limit contained in section 101.161(1), it would be impossible for sponsors to detail all possible effects or ramifications of the proposed amendment, most notably any indirect impact that could possibly touch upon government-sponsored insurance programs. The statute itself requires only that the voter be made aware of the chief purpose of the amendment, see § 101.161(1), Fla. Stat. (2004), and we have recognized that:
All that the Constitution requires or that the law compels or ought to compel is that the voter have fair notice of that which he must decide.... What the law requires is that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot.
*665 Askew, 421 So.2d at 155 (emphasis omitted) (quoting Hill, 72 So.2d at 798); see also Armstrong v. Harris, 773 So.2d 7, 13 (Fla.2000). In a recent decision, we approved a ballot summary that was argued to be misleading because it failed to adequately inform the voters about pre-exist-ing drug programs. See Advisory Opinion to the Att’y Gen. re Right to Treatment & Rehab, for Non-Violent Drug Offenses, 818 So.2d 491, 498 (Fla.2002). There, we held that the word limit contained within section 101.161 made it impossible for the amendment’s sponsors to include such a detailed explanation, and that the sponsors had complied precisely with that which was required of them — they apprised the voter of the chief purpose of the amendment. See id. We reasoned:
It is true ... that certain of the details of the [text] as well as some of its ramifications were either omitted from the ballot question or could have been better explained therein. That, however, is not the test. There is no requirement that the referendum question set forth the [text] verbatim nor explain its complete terms at great and undue length. Such would hamper instead of aiding the intelligent exercise of the privilege of voting. Under our system of free elections, the voter must acquaint himself with the details of a proposed ordinance on a referendum together with the pros and cons thereon before he enters the voting booth. If he does not, it is no function of the ballot question to provide him with that needed education. What the law very simply requires is that the ballot give the voter fair notice of the question he must decide so that he may intelligently cast his vote.
Id. (quoting Metropolitan Dade County v. Shiver, 365 So.2d 210, 213 (Fla. 3d DCA 1978)); see also Smith, 606 So.2d at 621 (“[V]oters are generally required to do their homework and educate themselves about the details of a proposal and about the pros and cons of adopting the proposal.”); Advisory Op. to the Att’y Gen. re Local Trustees, 819 So.2d 725, 732 (Fla.2002) (“[It can be presumed] that the average voter has a certain amount of common understanding and knowledge.”). Here, the sponsors have adequately informed the voters of the chief purpose of the amendment — that physicians be required to charge the same fee to all patients — and have accurately represented, in the title and summary, what is contained within the proposed amendment.
We note that the language in the summary reflects precisely that which is contained within the amendment. While the amendment provides that “[a] physician shall charge all purchasers the lowest fee for health care which the physician has agreed to accept,” the summary states that “[t]his amendment would require a physician to charge the same fee for the same health care service, procedure or treatment. Requires lowest fee which physician has agreed to accept.” A well-informed voter would recognize that the amendment broadly defines the word “charge” to mean “require, charge, bill, accept or be entitled to receive as payment for health care.” All voters will be on notice of this definition, as the full text of the amendment will be posted at all voting precincts on election day. See § 101.171, Fla. Stat. (2004); Ray v. Mortham, 742 So.2d 1276, 1283 (Fla.1999).
We fully understand that this amendment, as have many others, may be the subject of future litigation, and it will not be until that occurs that the full and complete application may be absolutely known. However, that fact alone does not preclude our approval of the ballot title and summary, as this Court’s review at this time is limited to whether the ballot title and summary are clear and unambiguous pursuant *666 to section 101.161(1), and we do not have the authority to either evaluate the merits of the proposed amendment or explore the entire world of possibilities of application. See Advisory Op. to the Att’y Gen. re Fla. Transp. Initiative, 769 So.2d at 368-69. “The Court must act with extreme care, caution, and restraint before it removes a constitutional amendment from the vote of the people.” Askew, 421 So.2d at 156. “Infringing on the people’s right to vote on an amendment is a power this Court should use only where the record .... establishes that the ballot language would clearly mislead the public concerning material elements of the proposed amendment and its effect on the present constitution.” Advisory Op. to the Att’y Gen. re Tax Limitation, 644 So.2d 486, 489 (Fla. 1994).
As noted above, it is impossible for the summary to include all possible ramifications of the proposed amendment, nor is it possible, without a crystal ball, for any person to foresee all possible effects the proposed amendment may have in the future. Certainly, if a ballot title and summary were required to include all possible ramifications, it is arguable that no proposed amendment would ever be approved within the current parameters. In Grose v. Firestone, 422 So.2d 303 (Fla.1982), the purpose of the proposed amendment was to assure that article I, section 12 of the Florida Constitution be read in conformity with the Fourth Amendment to the U.S. Constitution. See id. at 305. There, we held that the ballot summary and title were not misleading, there were no hidden meanings or deceptive phrases, and the summary expressed exactly what the amendment purported to do. See id. We held that the opponents were effectively seeking an exhaustive explanation reflecting their interpretation of the amendment and its possible future effects. In rejecting such notion we recognized: “To satisfy their request would require a lengthy history and analysis of the law of search and seizure and the exclusionary rule. Inclusion of all possible effects, however, is not required in the ballot summary.” Id. Likewise, here, the sponsors have satisfied the statute by informing the voters of the chief purpose of the amendment, and the summary cannot be expected to include and fully explain all possible effects and ramifications. See Advisory Op. to the Att’y Gen. re Amendment to Bar Gov’t from Treating People Differently Based on Race in Pub. Educ., 778 So.2d at 899 (“[Significant detail regarding implementation and speculative scenarios may be omitted ... [from] ballot summaries.”). Therefore, we hold that the ballot title and summary provide an accurate description of the proposed amendment.
CONCLUSION
Based upon the foregoing, we hold that the proposed amendment does not violate the single-subject rule, as the entire amendment constitutes “one subject and matter directly connected therewith.” See Fine, 448 So.2d at 989. Further, we hold that the proposed ballot title and summary adequately inform the voters of what they will be voting upon. Accordingly, there is no prohibition upon placing this proposed amendment on the ballot.
It is so ordered.
PARIENTE, C.J., and LEWIS, QUINCE, CANTERO and BELL, JJ., concur.
PARIENTE, C.J., concurs with an opinion, in which LEWIS and QUINCE, JJ., concur.
WELLS, J., dissents with an opinion, in which ANSTEAD, J., concurs.
ANSTEAD, J., dissents with an opinion.

. Article X of the Florida Constitution contains "Miscellaneous” provisions. Currently, the next available section number is 22. However, should section number 22 be taken prior to the adoption of the amendment, the Secretary of State has the authority to assign the proper section number if the amendment is adopted. See § 15.155(1), Fla. Stat. (2004).

. We also note that no comments in opposition to this proposed amendment have been filed with the Court. '

. Section 408.061 provides, in relevant part:
(1) The agency may require the submission by health care facilities, health care providers, and health insurers of data necessary to carry out the agency's duties....
(a) Data to be submitted by health care facilities may include, but are not limited to: case-mix data, patient admission or discharge data with patient and provider-specific identifiers included, actual charge data by diagnostic groups, financial data, accounting data, operating expenses, expenses incurred for rendering services to patients who cannot or do not pay, interest charges, depreciation expenses based on the expected useful life of the property and equipment involved, and demographic data. Data may be obtained from documents such as, but not limited to: leases, contracts, debt instruments, itemized patient bills, medical record abstracts, and related diagnostic information.
§ 408.061, Fla. Stat. (2003).