PER CURIAM.
The Attorney General of Florida has requested this Court’s opinion as to the validity of an initiative petition circulated pursuant to article XI, section 3 of the Florida Constitution, including the corresponding financial impact statement. We have jurisdiction. See art. IV, § 10, art. V, § 3(b)(10), Fla. Const. For the reasons expressed below, we approve the amendment, ballot title and summary, and the financial impact statement for placement on the ballot.
I. FACTS
On October 9, 2006, the Attorney General received a ballot initiative from the Secretary of State seeking to amend the Florida Constitution to provide for the funding *196 of embryonic stem cell research. This amendment is sponsored by Floridians for Stem Cell Research and Cures, Inc. The full text of the proposed amendment reads as follows:
Article X of the Florida Constitution is hereby amended by inserting at the end thereof the following section:
Funding of embryonic stem cell research. (a) There is hereby appropriated from the General Revenue Fund to the Department of Health the sum of $20 million in each of the ten fiscal years beginning with the year in which this amendment is adopted. With such funds the Department of Health shall make grants for embryonic stem cell research using, or using the derivatives of, human embryos that, before or after formation, have been donated to medicine under donor instructions forbidding intrauterine embryo transfer.
(b) For this purpose, an embryo is “donated to medicine” if and only, under conditions that satisfy applicable requirements for informed consent and do not involve financial inducement to any donor, the persons from whose cells the embryo originates give the embryo to another under written instructions that the recipient shall use the embryo in biomedical research or therapy. “Financial inducement” includes any valuable consideration but excludes (1) reimbursement for reasonable costs incurred in connection with a donation, and (2) reasonable compensation to a donor from whom an oocyte is recovered, and to the donor of any other cell recovered by an invasive procedure, for the preparation for and time, burden, and risk of such recovery.
(c) The funds appropriated hereby shall be granted to nonprofit academic and other research institutions situated within the state. Grantees shall be chosen on the basis of a recommended ordering of applications by scientific merit as reckoned in a peer review process by disinterested experts in the relevant fields.
(d)This provision shall be self-executing and effective immediately upon adoption. This appropriation shall be nonlapsing such that any portion of a yearly appropriation not distributed shall accumulate for distribution in subsequent years. The Department of Health is authorized to promulgate administrative rules for the implementation hereof.
The ballot title for the proposed amendment is “FUNDING OF EMBRYONIC STEM CELL RESEARCH.” The summary for the proposed amendment states:
This amendment appropriates $20 million annually for ten fiscal years for grants by the Department of Health to Florida nonprofit institutions to conduct embryonic stem cell research using, or using derivatives of, human embryos that, before or after formation, have been donated to medicine under donor instructions forbidding intrauterine embryo transfer. An embryo is “donated to medicine” only if given without receipt of consideration other than cost reimbursement and compensation for recovery of donated cells.
The Financial Impact Statement for this proposed amendment, as prepared by the Financial Impact Estimating Conference, provides: “This amendment requires the state to spend $20 million a year for ten years.”
II. GOVERNING LAW
The citizen ballot initiative process is recognized in the Florida constitution:
The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such *197 revision or amendment, except for those limiting the power of government to raise revenue, shall embrace but one subject and matter directly connected therewith.
Art. XI, § 3, Fla. Const.
The process begins when the sponsoring party files a petition and copy of the proposed amendment with the custodian of state records, the Secretary of State. Id. Accompanying this petition are signatures collected from electors across the state. Id. Once the Secretary of State verifies that the threshold number of valid signatures has been reached, notice of the initiative is sent to the Attorney General, who then must request an advisory opinion from this Court. Art. IV, § 10, Fla. Const.; § 16.061, Fla. Stat. (2006). The advisory opinion is to address the ballot initiative’s compliance with article XI, section 3 of the Florida Constitution, which requires that an amendment by ballot touch upon “one subject and matter directly connected therewith.” Art. IV, § 10, Fla. Const.
Through prior case law and advisory opinions, this Court has explained its standard of review as follows:
The Court’s inquiry, when determining the validity of initiative petitions, is limited to two legal issues: whether the petition satisfies the single-subject requirement of article XI, section 3, Florida Constitution, and whether the ballot titles and summaries are printed in clear and unambiguous language pursuant" to section 101.161, Florida Statutes.
Advisory Op. to the Att’y Gen. re Amendment to Bar Gov’t from Treating People Differently Based on Race in Pub. Educ., 778 So.2d 888, 890 (Fla.2000) (citing Advisory Op. to the Att’y Gen. re Right of Citizens to Choose Health Care Providers, 705 So.2d 563, 565 (Fla.1998); Advisory Op. to the Att’y Gen. re Prohibiting Pub. Funding of Political Candidates’ Campaigns, 693 So.2d 972, 974 (Fla.1997)).
When reviewing a proposed amendment to determine compliance with the single subject and ballot summary requirements, this Court has stated that it will “not address the merits or wisdom of the proposed amendment.” Advisory Op. to the Att’y Gen. re Fla. Marriage Prot. Amendment, 926 So.2d 1229, 1233 (Fla.2006) (citing Amendment to Bar Gov’t from Treating People Differently Based on Race in Pub. Educ., 778 So.2d at 891). Additionally:
[W]e have recognized that we “must act with extreme care, caution, and restraint before [we] remove[ ] a constitutional amendment from the vote of the people.” Askew v. Firestone, 421 So.2d 151, 156 (Fla.1982). In elaborating on this latter principle, we have noted that “the Court has no authority to inject itself in the process, unless the laws governing the process have been ‘clearly and conclusively’ violated.” Advisory Opinion to the Attorney Gen. re Right to Treatment & Rehab, for Nom-Violent Drug Offenses, 818 So.2d 491, 498-99 (Fla. 2002). It is within the framework of these fundamental principles that we review ... proposed amendments] and ballot language.
Fla. Marriage Prot. Amendment, 926 So.2d at 1233 (second and third alterations in original).
A. Single-Subject Rule
The single-subject requirement has two components: “(1) it prevents ‘logrolling,’ a practice that combines separate issues into a single proposal to secure passage of an unpopular issue; and (2) it ‘prevents] a single constitutional amendment from substantially altering or performing the functions of multiple aspects of government.’ ” Id. (alteration in original) (quoting Adviso *198 ry Op. to the Att’y Gen. re the Med. Liab. Claimant’s Comp. Amendment, 880 So.2d 675, 677 (Fla.2004)). To comply with the single-subject requirement, “a proposed amendment must manifest a ‘logical and natural oneness of purpose’ in order to satisfy the single-subject requirement.” Med. Liab. Claimant’s Comp. Amendment, 880 So.2d at 677 (quoting Fine v. Firestone, 448 So.2d 984, 990 (Fla.1984)). “This determination requires the Court to consider whether the proposed amendment affects separate functions of government, as well as how it affects other provisions of the constitution.” Id. (citing In re Advisory Op. to the Att’y Gen. — Restricts Laws Related to Discrimination, 632 So.2d 1018, 1020 (Fla.1994)).
1. Logrolling
Logrolling occurs when “several separate issues are rolled into a single initiative in order to aggregate votes or secure approval of an otherwise unpopular issue.” In re Advisory Op. to Att’y Gen. — re Save Our Everglades, 636 So.2d 1336, 1339 (Fla.1994). Thus, part of the goal of this Court’s single-subject scrutiny is to “avoid voters having to accept part of a proposal which they oppose in order to obtain a change which they support.” Fine, 448 So.2d at 993. The Court uses a “oneness of purpose” standard, which looks at whether a proposed amendment “may be logically viewed as having a natural relation and connection as component parts or aspects of a single dominant plan or scheme. Unity of object and plan is the universal test....” Id. at 990 (quoting City of Coral Gables v. Gray, 154 Fla. 881, 19 So.2d 318, 320 (1944)).
The amendment’s opponents, Citizens for Science and Ethics, Inc. (“Citizens”), argue that the proposed amendment does logroll, combining the questions of state funding for the research with embryo and cell donor compensation and cloning. Specifically, Citizens argues that voters will be forced to decide if they want the state to fund stem cell research at all, if the state should fund it at the specified level, if the donors should be compensated, and finally if the state should also support “therapeutic cloning.”
We find that the proposed amendment only addresses one subject, embryonic stem cell research. While the amendment mandates a specific level of state funding for such research, and also provides definitions and directions as to how the Department of Health will award grants in this respect, including issues of compensation, these provisions are “logically related to [the amendment’s] purpose.” Advisory Op. to the Att’y Gen. re Patient’s Right to Know about Adverse Med. Incidents, 880 So.2d 617, 620 (Fla.2004); see Advisory Op. to the Att’y Gen. re Voluntary Universal Pre-Kindergarten Educ., 824 So.2d 161, 165 (Fla.2002) (holding that proposed amendment’s details regarding funding did not constitute logrolling since they merely “provide! ] the details of how the amendment will be implemented”). We conclude, therefore, that the proposed amendment does not reach any other subject and thus does not constitute logrolling.
2. Altering or Performing the Functions of Multiple Branches of Government
A single-subject violation can also occur when a proposed amendment “alters or performs the functions of multiple branches of government.” Fla. Marriage Prot. Amendment, 926 So.2d at 1235. We have clarified that “[a] proposal that affects several branches of government will not automatically fail; rather, it is when a proposal substantially alters or performs the functions of multiple branches that it violates the single-subject test.” Advisory Op. to the Att’y Gen. re Fish & Wildlife Conservation Comm’n, 705 So.2d 1351, 1353-54 (Fla.1998) (emphasis added) (citing Save *199 Our Everglades, 636 So.2d at 1340). This Court has also repeatedly emphasized that the rationale of the single-subject restriction in general is to guard against “precipitous” or “cataclysmic” changes to the government structure. See, e.g., Advisory Op. to Att’y Gen. re Additional Homestead Tax Exemption, 880 So.2d 646, 650 (Fla.2004).
The amendment’s opponents argue that the $20 million annual funding requirement impinges on both the legislative appropriations process and the executive veto power and is similar to the initiative this Court struck in Advisory Op. to the Att’y Gen. re Requirement for Adequate Public Educ. Funding 703 So.2d 446 (Fla.1997). Furthermore, Citizens argues that the affected governing agency in this instance is not left with wide discretion in implementing the new grants.
In Public Education Funding, this Court found that a proposed amendment requiring that the Legislature spend forty percent of its annual budget on education, not including lottery proceeds and federal funds, violated the single-subject rule. 703 So.2d at 447. In finding that the proposed amendment addressed more than one subject, the majority concluded that the “amendment would substantially alter the legislature’s present discretion in making value choices as to appropriations among the various vital functions of State government.” Id. at 449. In addition, the Court found that the Governor’s line-item veto power would be limited since he would be unable to veto any specific appropriation within the education appropriation if the veto would reduce the education appropriation to less than the required 40 percent. Id. Thus, since the amendment was found to “substantially affect more than one function of government and multiple provisions of the Constitution,” it was stricken from the ballot. Id. at 450. We later commented on these restrictions in Advisory Opinion to the Attorney General re Protect People, Especially Youth, From Addiction, Disease, . and Other Health Hazards of Using Tobacco, 926 So.2d 1186, 1194 (Fla.2006). “This massive restriction on appropriations also limited the entirety of the State’s other functions to the remaining sixty percent of the budget, rendering many other government functions impossible to fund.” 926 So.2d at 1193.
However, given the disparity between the required appropriations in the respective amendments, we find that the “massive restriction” at issue in Public Education Funding can be distinguished from the instant initiative because the substantial impact on the Legislature’s function we found in Public Education Funding is simply not present in this proposed amendment. The amount required for research is relatively nominal when compared to the State’s annual budget overall[1] and cannot be characterized as substantially restricting the Legislature’s ability to fund other programs. Further, mandating some specific annual appropriation is an essential ingredient necessary to accomplish the narrow goal set forth in the amendment: the state financing of embryonic stem cell research. Mandating research without designating a funding level would leave the goal of the amendment solely to legislative discretion.
We find the proposed amendment more closely resembles the one we approved in Protect People, Especially Youth. The amendment at issue in that case also specifically required the Legislature to appropriate a fixed amount annually, equal to *200 fifteen percent of the tobacco settlement funds paid to the state in 2005, for the purposes of fulfilling the anti-tobacco programs detailed in the amendment. 926 So.2d at 1189-90. The appropriation required greatly exceeded the amount mandated in the subject amendment. However, we concluded that the amendment in that case was not “impermissibly rigid and restrictive to the legislative and executive branches.” Id. at 1193. Consistent with our decision in Protect People, Especially Youth, we conclude that the subject proposed amendment does not “substantially” alter or perform the functions of multiple aspects of government, and thus does not violate the single-subject rule. See, e.g., Save Our Everglades, 636 So.2d at 1340.
We also note that section 100.371(5), Florida Statutes (2006), now requires the Financial Impact Estimating Conference to provide a statement to the Attorney General and the Secretary of State for inclusion on the ballot detailing the costs stemming from a proposed constitutional amendment. Hence, the fact that an amendment contains a specific funding requirement is not necessarily dispositive of whether it substantially alters or performs the duties of the Legislature.
B. Ballot Title and Summary
The title and ballot summary of any proposed amendment must comply with section 101.161, Florida Statutes, which states:
Whenever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot ... followed by the word “yes” and also by the word “no,” .... Except for amendments and ballot language proposed by joint resolution, the substance of the amendment ... shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure.... The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.
§ 101.161(1), Fla. Stat. (2006).
The “clear and unambiguous” requirement ensures that a voter has notice of the subject matter and issues addressed by the proposed amendment. Fla. Marriage Prot. Amendment, 926 So.2d at 1236 (quoting Save Our Everglades, 636 So.2d at 1341). In evaluating a proposed amendment:
The proper analysis to assess whether [the] ballot title and summary meet this requirement focuses on two questions: (1) whether the ballot title and summary, in clear and unambiguous language, fairly inform the voter of the chief purpose of the amendment; and (2) whether the language of the title and summary, as written, misleads the public.
Id. at 1236 (citing Advisory Op. to the Att’y Gen. re Additional Homestead Tax Exemption, 880 So.2d 646, 651-52 (Fla.2004)). The ballot title and summary do not have to discuss every detail or consequence of the amendment, but they must be sufficiently “accurate and informative.” Advisory Op. to the Att’y Gen. re Protect People, Especially Youth, 926 So.2d at 1194.
Opponents of the proposed amendment argue that the abbreviated discussion of compensation in the final sentence of the ballot summary violates both prongs of the ballot summary analysis: first, it does not provide a fair notice of the contents of the amendment, and furthermore it is vague and misleading. Specifically, Citizens argues that the summary does not provide fair notice of what constitutes “compensation” or who would receive it, and also that *201 it misleads the public regarding what, exactly, is compensable. We disagree.
The issue of compensation arises within the definition of the term “donated to medicine,” which is defined in both the summary and the amendment. The summary provides that “[a]n embryo is ‘donated to medicine’ only if given without receipt of consideration other than cost reimbursement and compensation for recovery of donated cells.” The text of the actual amendment further explains that an embryo is “donated to medicine” if it does not involve “financial inducement.” “Financial inducement” is then defined as excluding reasonable cost reimbursement for donations and reasonable compensation for the recovery of cells. The amendment states that this can include compensation for the preparation, time, burden and risk of cells recovered through invasive procedures. The summary makes clear that donors will be reimbursed for costs and compensated for the recovery of the embryos under the proposed amendment.
This Court has previously approved summaries that omit certain details that are otherwise included in the full amendment. As explained in Carroll v. Firestone, 497 So.2d 1204, 1206 (Fla.1986), “[i]t is not necessary to explain every ramification of a proposed amendment, only the chief purpose.” See also Med. Liab. Claimant’s Comp. Amendment, 880 So.2d at 679 (“We also note -that it is not necessary for the title and summary to explain every detail or ramification of the proposed amendment.”) (citing Public Funding of Political Candidates’ Campaigns, 693 So.2d at 975). In Advisory Opinion to the Attorney General re Physician Shall Charge the Same Fee for the Same Health Care Service to Every Patient, 880 So.2d 659 (Fla.2004), we emphasized in approving a ballot summary, “Given the seventy-five word limit contained in section 101.161(1), it would be impossible for sponsors to detail all possible effects or ramifications of the proposed amendment.... The statute itself requires only that the voter be made aware of the chief purpose of the amendment.” Id. at 664. Accordingly, despite the fact that the summary does not detail how potential donors might be compensated and for what expenses they could be reimbursed, the summary nevertheless fairly informs the voter of the chief purpose of the amendment, the state funding of embryonic stem cell research.
Regarding the second prong of the inquiry into the summary, opponents also claim that the explanation regarding compensation is ambiguous and misleading since voters are informed only that donors will be compensated, but not how much they will be compensated. Opponents further argue that if the summary is attempting to address a concern that state funds should not encourage the donation of cells for money, it misleads voters by implying that the consideration given in exchange for the embryos will be more limited than the amendment actually provides. However, as explained above, this Court has repeatedly upheld summaries that do not detail every facet of an amendment’s proposal. The language in the summary closely tracks that which is used in the amendment itself, and the summary also does not contain the type of political rhetoric this Court rejected in such summaries as Marriage Protection and Homestead Tax Exemption.
Accordingly; we conclude the instant summary fulfills the basic purpose of section 101.161, Florida Statutes, in that it “provide[s] fair notice of the content of the proposed amendment so that the voter will not be misled as to its purpose, and can cast an intelligent and informed ballot.” Advisory Op. to Att’y Gen. — Fee on Ever *202 glades Sugar Prod., 681 So.2d 1124, 1127 (Fla.1996).
C. Financial Impact Statement
This Court must also determine whether the financial impact statement complies with the requirements provided in the Florida Constitution and the statute. Article XI, section 5, Florida Constitution, addresses financial impact statements and provides in relevant part:
(c) The legislature shall provide by general law, prior to the holding of an election pursuant to this section, for the provision of a statement to the public regarding the probable financial impact of any amendment proposed by the initiative pursuant to section 3.
Section 100.371(5), Florida Statutes (2006), now addresses the financial impact statement as follows:
(5)(a) Within 45 days after receipt of a proposed revision or amendment to the State Constitution by initiative petition from the Secretary of State, the Financial Impact Estimating Conference shall complete an analysis and financial impact statement to be placed on the ballot of the estimated increase or decrease in any revenues or costs to state or local governments resulting from the proposed initiative. The Financial Impact Estimating Conference shall submit the financial impact statement to the Attorney General and Secretary of State.
[[Image here]]
(b)3. Principals of the Financial Impact Estimating Conference shall reach a consensus or majority concurrence on a clear and unambiguous financial impact statement, no more than 75 words in length, and immediately submit the statement to the Attorney General. Nothing in this subsection prohibits the Financial Impact Estimating Conference from setting forth a range of potential impacts in the financial impact statement.
§ 100.371(5), Fla. Stat. (2006). In deciding the validity of a financial impact statement, the Court has limited itself only to addressing whether the statement is clear, unambiguous, consists of no more than seventy-five words, and is limited to addressing the estimated increase or decrease in any revenues or costs to the state or local governments. See Advisory Op. re Protect People from Health Hazards of Using Tobacco, 926 So.2d 1186, 1194 (Fla.2006). In the cases where this Court found the financial impact statement to be defective, it was because the statement did not comply with these specific requirements. See, e.g., Advisory Op. to Att’y Gen. re Repeal of High Speed Rail Amendment, 880 So.2d 628, 629 (Fla.2004) (rejecting the proposed financial impact statement because certain provisions were not expressed in terms of the “probable financial impact” and because the statement went beyond addressing “revenues or costs to state or local governments”); Advisory Op. to the Att’y Gen. re Pub. Prot. from Repeated Med. Malpractice, 880 So.2d 686, 687 (Fla.2004) (rejecting the proposed financial impact statement because phrase “range of potential impacts” in section 100.371(6)(b)(3) must relate to the phrase “probable financial impact” set forth in the constitution and the proposed statement included potential impacts beyond monetary estimates); Advisory Op. to the Att’y Gen. re Authorizes Miami-Dade & Broward County Voters to Approve Slot Machines in Parimutuel Facilities, 880 So.2d 689 (Fla.2004) (same).
The financial impact statement for this proposed amendment provides as follows: “This amendment requires the state to spend $20 million a year for ten years.” The instant financial impact statement is well within the 75-word limit and it clearly and unambiguously conveys that the *203 amendment will cost the state $20 million a year for ten years. We find no basis to reject the financial impact statement under section 100.371(6).
III. CONCLUSION
For the reasons stated, we hold that the initiative petition and proposed ballot title and summary for the “Funding of Embryonic Stem Cell Research” meet the legal requirements of article XI, section B of the Florida Constitution and section 101.161(1), Florida Statutes (2006). Likewise, the accompanying financial impact statement is in accordance with section 100.371(5). Accordingly, we approve the amendment and financial impact statement for placement on the ballot.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, and QUINCE, JJ„ concur.
BELL, J., concurs in part and dissents in part with an opinion, in which CANTERO, J., concurs.

. We take judicial notice of the fact that the budget for the State of Florida for fiscal year 2007-2008 is approximately $72 billion. See Fla. Conf. Report on SB 2800 (2007) at 428 (General Appropriations Act for Fiscal Year 2007-2008).