2 So.3d 118 (2008)
ADVISORY OPINION TO the ATTORNEY GENERAL RE FLORIDA GROWTH MANAGEMENT INITIATIVE GIVING CITIZENS the RIGHT TO DECIDE LOCAL GROWTH MANAGEMENT PLAN CHANGES.
Advisory Opinion to the Attorney General re: Florida Growth Management Initiative Giving Citizens the Right to Decide Local Growth Management Plan Changes.
Nos. SC08-318, SC08-492.
Supreme Court of Florida.
December 18, 2008.
Rehearing Denied January 29, 2009.
Bill McCollum, Attorney General, Louis F. Hubener, Chief Deputy Solicitor General, and Joslyn Wilson, Assistant Attorney General, Tallahassee, FL, for Petitioner.
Stephen H. Grimes of Holland and Knight and Susan L. Kelsey of Kelsey Appellate Law Firm, P.A., Tallahassee, FL, on behalf of Floridians for Smarter Growth, Inc., as Sponsor.
Ross Stafford Burnaman, Tallahassee, FL, on behalf of Florida Hometown Democracy, Inc., as Opponent.
WELLS, J.
The Attorney General of Florida has requested this Court's opinion as to the validity of an initiative petition sponsored by Floridians for Smarter Growth, Inc., and the accompanying Financial Impact Statement submitted by the Financial Impact Estimating Conference. We have jurisdiction. See art. IV, § 10, art. V, § 3(b)(10), Fla. Const. For the reasons explained below, we conclude that the proposed amendment complies with the single-subject requirement of article XI, section 3 of the Florida Constitution, that the ballot title and summary comply with section 101.161(1), Florida Statutes (2008), and that the financial impact statement complies with section 100.371, Florida Statutes (2008).

I. FACTS
The Smarter Growth initiative petition seeks to amend article II, section 7, of the Florida Constitution. The ballot title and summary read as follows:
Florida Growth Management Initiative Giving Citizens the Right to Decide Local Growth Management Plan Changes Allows Floridians to call for voter approval of changes to local growth management plans through a citizen petition. Voter approval of growth management plan changes will be required if 10% of the voters in the city or county sign a petition calling for such a referendum. Defines terms and establishes petition requirements.
The full text of the proposed amendment states:
a) Statement and Purpose:
The Legislature has enacted growth management and land use planning legislation; these laws do not provide for voters' direct approval of the resulting plans or amendments. The purpose of this amendment is to provide a limited opportunity for voters to approve or disapprove these plans or amendments. Because thousands of growth management plans and amendments are adopted statewide each year, this amendment would limit such referenda to situations where a sufficient number of persons file a petition seeking such a referendum during a set period of time. The criteria for signing and filing a petition *119 are intended to demonstrate that there is substantial interest in a referendum, and are based, in part, on existing Section 550.175, Fla. Stat. This amendment is intended to modify existing law, permit flexibility in future growth management-related legislation (except rules which would affect voters' ability to petition for referenda), and pre-empt or supersede recent proposals to subject all comprehensive land use plans and amendments to votes, thus balancing competing interests without over-burdening voters.
b) Amendment of Florida Constitution:
Art. II, Section 7, Fla. Const., is amended by inserting the following new subsection at the end thereof, to read:
Florida Growth Management Initiative Petitions.
a) In addition to any power or ability of voters to participate in growth management planning processes provided by this Section or by general law, the registered voters of a local government may offer a Florida Growth Management Initiative Petition regarding any growth management plan or amendment to such a plan.
b) If a valid and sufficient Florida Growth Management Initiative Petition is filed and verified by the appropriate election authorities for a local government, the local government shall conduct a referendum approving or disapproving the specific growth management plan or amendment. The referendum shall be conducted as provided by applicable general law of the State or the local government. If a plan or amendment is disapproved in such a referendum, it is not effective and may not be adopted or implemented by the local government or relied on by others. The fact that a plan or amendment has been the subject of a referendum under this Section does not preclude future changes to that plan or amendment, or exempt such changes from these or other procedures and requirements. If a valid and sufficient Florida Growth Management Initiative Petition is not filed for a particular plan or amendment, notwithstanding any other provision of this Section or of general law, no referendum on that particular plan or amendment shall be held pursuant to this Section.
c) Definitions: For purposes of this section, the following terms shall have the following meanings:
1) "Local government" means a county or municipality.
2) "Growth management plan" means a plan to guide and control future land development in an area under the jurisdiction of a local government, including a comprehensive land use plan or similar document, and includes amendments to such plans, however described.
3) "Florida Growth Management Initiative Petition" means a written petition, on a form designated for that purpose, containing and describing all elements of the applicable growth management plan or amendment, and otherwise conforming in all respects to any requirements imposed by general law. Not more than one applicable growth management plan or amendment may be included in any one petition.
4) "Offer a Florida Growth Management Initiative Petition" means, in addition to any other requirement imposed by general law, that one or more individuals registered to vote for elections of a local government may *120 complete a Florida Growth Management Initiative Petition form and deposit the form with the County Supervisor of Elections or City Clerk (or similar election authority for the local government). The individuals completing the form must provide identification information, including name, address, telephone numbers, any Internet address or website owned, operated or used by the individuals which contains or will contain information on the particular plan or amendment which is the subject of the Petition, and any information indicating whether they have a financial interest in the particular plan or amendment which is the subject of the Petition (including interests involving personal, commercial or other land uses affected by the plan or amendment), and if so, describing the financial interest. The identification information shall be made available to the public, along with notice of the availability of the Petition; posting of this information on the Internet, in a manner reasonably calculated by the election authority to inform the public, shall be considered sufficient public availability of this information. Individuals who are registered voters of the local government and who are in favor of holding a referendum on the particular growth management plan or amendment shall be permitted to sign the Florida Growth Management Initiative Petition; a signature shall be affixed in a manner which clearly indicates that the signer is in favor of holding the referendum. Every signature upon every Florida Growth Management Initiative Petition must be signed at the office of the appropriate County Supervisor of Elections or City Clerk (or similar election authority for the local government), and the signer must present at the time of such signing evidence showing the person's qualification as a voter of the local government at the time of the signing of the petition. Once the appropriate County Supervisor of Elections or City Clerk (or similar election authority for the local government) determines that, prior to verification, the Florida Growth Management Initiative Petition contains the facially-valid original signatures of at least ten percent of persons registered to vote in elections of the local government, the election authority shall notify the persons who completed and deposited the petition form. The election authority shall inquire if the persons wish to offer the Florida Growth Management Initiative Petition for verification of the signatures; if the persons wish to offer the Florida Growth Management Initiative Petition, the election authority shall verify the signatures, with any costs paid by the offering persons, and consider the Petition offered and submitted.
5) "Valid and sufficient Florida Growth Management Initiative Petition" means a written petition containing the valid original signatures of at least 10 percent of persons registered to vote in elections of the local government, and which is offered and submitted to the appropriate County Supervisor of Elections or City Clerk (or similar election authority for the local government) within sixty days from the date of the first signature on the petition.
c) Effective Date and Severability:
This amendment shall be self-executing and effective on the date it is approved by the electorate. If any portion of this measure is held invalid for any reason, the remaining portion of this measure, *121 to the fullest extent possible, shall be severed from the void portion and given the fullest possible force and application.
Floridians for Smarter Growth, the sponsor of the amendment, filed briefs in support of the proposed amendment. Florida Hometown Democracy, Inc., which previously submitted a competing proposed amendment that would require local governments to hold referenda on new comprehensive land-use plans or amendments to existing comprehensive land-use plans, see Advisory Op. to Att'y Gen. re Referenda Required for Adoption & Amendment of Local Gov't Comprehensive Land Use Plans, 938 So.2d 501 (Fla.2006), filed briefs in opposition to the proposed amendment.

II. REVIEW OF PROPOSED AMENDMENT
When the Court renders an advisory opinion concerning a proposed constitutional amendment arising through the citizen initiative process, the Court limits its inquiry to two issues: (1) whether the amendment itself violates the single-subject requirement of article XI, section 3, Florida Constitution; and (2) whether the ballot title and summary violate the clarity requirements of section 101.161(1), Florida Statutes (2008). The Court will not address the merits or wisdom of the proposed amendment and "must act with extreme care, caution, and restraint before it removes a constitutional amendment from the vote of the people." Advisory Op. to Att'y Gen. re Fla. Minimum Wage Amendment, 880 So.2d 636, 639 (Fla.2004) (quoting Askew v. Firestone, 421 So.2d 151, 156 (Fla.1982)).

A. Single-Subject Requirement
Article XI, section 3, Florida Constitution, sets forth the single-subject requirement for a proposed constitutional amendment arising via the citizen initiative process. The single-subject rule is intended to prevent an amendment from engaging in either of two practices: (a) logrolling, or (b) substantially altering or performing the functions of multiple branches of state government. "A proposed amendment meets this test when it `may be logically viewed as having a natural relation and connection as component parts or aspects of a single dominant plan or scheme. Unity of object and plan is the universal test....'" Advisory Op. to Att'y Gen. re Fairness Initiative, 880 So.2d 630, 634 (Fla.2004) (Fairness Initiative) (quoting Fine v. Firestone, 448 So.2d 984, 990 (Fla.1984)).
The Smarter Growth amendment does not engage in logrolling. Like the proposed amendment discussed in Advisory Opinion to the Attorney General re Referenda Required for Adoption & Amendment of Local Government Comprehensive Land Use Plans, 902 So.2d 763, 766 (Fla. 2005) (Land Use Plans 2005), this proposed amendment is limited to the single subject of providing for local referenda regarding the adoption and amendment of local growth management plans, albeit in more limited circumstances than contemplated by the Land Use Plans initiative. It does not combine any "unrelated provisions." Id. Also like the proposed amendment reviewed in Land Use Plans 2005, the Smarter Growth amendment does not substantially alter or perform the functions of multiple branches of state government because all of its provisions pertain only to the local government legislative process of enacting and amending local growth management plans. The amendment does not involve other levels of government.
This Court has also considered whether a proposed amendment would substantially affect multiple constitutional provisions as part of its single-subject analysis. See, e.g., Advisory Op. to Att'y Gen. re Tax *122 Limitation, 644 So.2d 486, 490 (Fla.1994). "[T]he possibility that an amendment might interact with other parts of the Florida Constitution is not sufficient reason to invalidate the proposed amendment." Advisory Op. to Att'y Gen. re Ltd. Casinos, 644 So.2d 71, 74 (Fla.1994) (citing Advisory Op. to Att'y Gen. EnglishThe Official Language of Fla., 520 So.2d 11, 12-13 (Fla.1988)). The Smarter Growth amendment will substantially affect article II, section 7 of the Florida Constitution. However, contrary to Hometown Democracy's arguments, the proposed amendment would only interact with, not substantially affect, other provisions of the Florida Constitution.
In sum, the proposed amendment complies with the single-subject requirement of article XI, section 3 of the Florida Constitution.

B. Ballot Title and Summary
Section 101.161, Florida Statutes (2008), sets forth the requirements for the ballot title and summary of a proposed constitutional amendment:
[T]he substance of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure.... The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.
§ 101.161(1), Fla. Stat. (2008). This Court has explained that
[I]n conducting its inquiry into the validity of a proposed amendment under section 101.161(1), the Court asks two questions. First, the Court asks whether "the ballot title and summary ... fairly inform the voter of the chief purpose of the amendment." Right to Treatment and Rehabilitation for Non-Violent Drug Offenses, 818 So.2d at 497. Second, the Court asks "whether the language of the title and summary, as written, misleads the public." Advisory Op. to Att'y Gen. re Right of Citizens to Choose Health Care Providers, 705 So.2d 563, 566 (Fla.1998).
Fairness Initiative, 880 So.2d at 635-36. While the ballot title and summary must accurately inform voters of the content of the proposed amendment, this Court has held that "[i]t is not necessary to explain every ramification of a proposed amendment, only the chief purpose." In re Advisory Op. to Att'y Gen. re Save Our Everglades, 636 So.2d 1336, 1341 (Fla.1994) (quoting Carroll v. Firestone, 497 So.2d 1204, 1206 (Fla.1986)).
The ballot title and summary in this case comply with the word-length limitations of section 101.161(1), Florida Statutes (2008). Thus, the issue for this Court is whether the ballot title and summary clearly and unambiguously state the chief purpose of the amendment without misleading voters.
The ballot title purports that the proposed amendment would give "Citizens the Right to Decide Local Growth Management Plan Changes." When read in conjunction with the ballot summary, the "Right to Decide" language in the title does not misrepresent the chief purpose and legal impact of the amendment. The second sentence of the summary clarifies that to trigger a referendum on the adoption or amendment of a local growth management plan, ten percent of the voters in the potentially affected local government must sign a petition calling for a referendum. This sentence accurately conveys the purpose stated in the amendment text, which is "to provide a limited opportunity for voters to approve or disapprove" plans or amendments resulting from growth management and land use planning laws. See Advisory Op. to Att'y General re Fla. Transp. Initiative for Statewide High *123 Speed Monorail, Fixed Guideway or Magnetic Levitation Sys., 769 So.2d 367, 371 (Fla.2000) (finding term "statewide" used in ballot title not misleading because summary accurately explained that proposed amendment would require system linking Florida's five largest urban areas).
Furthermore, we reject Hometown Democracy's argument that the ballot title and summary are misleading because they do not inform voters of the details of the petition process, such as the requirements that the voter initiating the petition publicly disclose certain personal information and that the petition can only be signed by registered voters at certain government offices within a sixty-day period. We find the instant ballot title and summary distinguishable from those found to omit material information in Advisory Opinion to the Attorney General re Amendment to Bar Government from Treating People Differently Based on Race in Public Education, 778 So.2d 888 (Fla.2000) (Treating People Differently); and Advisory Opinion to the Attorney General re Right of Citizens to Choose Health Care Providers, 705 So.2d 563 (Fla.1998) (Health Care Providers).
In Treating People Differently, the Court found that the ballot titles and summaries, which stated that the proposed amendments would bar the government from treating people differently based on race and end governmental discrimination, were misleading because they falsely implied that no constitutional provision addressing differential treatment existed at that time and that the government was then practicing discrimination. 778 So.2d at 898. The ballot titles and summaries failed to disclose that the proposed amendment would eliminate existing protections granted to victims of discrimination by the Florida Constitution. Id. at 894. In Health Care Providers, the Court found that the title and summary, which stated that the amendment would establish "the right of citizens to choose health care providers," violated section 101.161 because in reality the amendment would likely make it more difficult for some to choose a health care provider by prohibiting insurers from contracting with insured individuals on the issue of health care providers. 705 So.2d at 565-66.
The current ballot title and summary do not mislead voters into thinking that the amendment would extend a right to decide while in actuality the amendment would effectively restrict opportunities for voters to decide local growth management plans. The proposed amendment states that it will operate "[i]n addition to any power or ability of voters to participate in growth management planning processes provided by this Section or by general law." Thus, the proposed amendment, even with its petition requirements, will not have the effect of limiting rather than expanding existing opportunities for voters to become involved in the adoption and amendment of local growth management plans. We find the instant proposed amendment analogous to the amendment reviewed in Advisory Opinion to the Attorney General Limited Political Terms in Certain Elective Offices, 592 So.2d 225, 228 (Fla. 1991), where the Court held that the summary was not misleading because it was "not a situation in which the ballot summary conceal[ed] a conflict with an existing provision." Because the Smarter Growth amendment will not conflict with or restrict any existing rights to subject local growth management plans to local referenda, the lack of detail concerning the petition process does not render the title and summary misleading.
In conclusion, we conclude that the ballot title and summary are not materially misleading due to omission. The ballot title and summary satisfy the requirements *124 of section 101.161, Florida Statutes (2008).[1]

C. Financial Impact Statement
The financial impact statement prepared by the Financial Impact Estimating Conference (FIEC) reads as follows:
The direct impact of this amendment on local government expenditures cannot be determined precisely. Local governments will incur significant costs to establish and administer the new Florida Growth Management Initiative petition process. Additional costs will be incurred for petition notification and signature collection, as well as ballot preparation and associated expenses for conducting any required referendum. The direct impact on state government expenditures will be insignificant. There will be no direct impact on government revenues.
This Court's review of financial impact statements is narrow. The Court has "limited itself only to address whether the statement is clear, unambiguous, consists of no more than seventy-five words, and is limited to address the estimated increase or decrease in any revenues or costs to the state or local governments." Advisory Opinion to the Attorney General re Referenda Required for Adoption & Amendment of Local Government Comprehensive Land Use Plans, 963 So.2d 210, 214 (Fla. 2007) (Land Use Plans 2007). The financial impact statement in this case is exactly seventy-five words. Thus, the issues for the Court are whether the statement is clear and unambiguous and whether it is limited to addressing the estimated increase or decrease in revenues or costs.
The text of the Smarter Growth amendment states that its purpose or intended effect is to "provide a limited opportunity for voters to approve or disapprove these plans or amendments" and to "limit such referenda to situations where a sufficient number of persons file a petition seeking such a referendum during a set period of time." The financial effect of the Smarter Growth amendment is difficult to quantify because to a large degree the increase or decrease in costs due to the proposed amendment will depend on how frequently counties and cities create new growth management plans or amend existing ones and on how frequently voters in the affected areas decide to avail themselves of the petition process that would be created by the amendment.
As directed by this Court in Land Use Plans 2007, the FIEC acknowledged in this financial impact statement that the ultimate cost of this proposed amendment is dependent on voter action, stating "[a]dditional costs will be incurred for petition notification and signature collection, as well as ballot preparation and associated expenses for conducting any required referendum." The FIEC also delineated the noncontingent cost of establishing and administering the initiative process, stating that "[l]ocal governments will incur significant costs to establish and administer the new Florida Growth Management Initiative petition process." Overall, the financial impact statement is necessarily indefinite but not unclear or ambiguous.

*125 III. CONCLUSION
For the reasons set forth above, we conclude that the proposed amendment complies with the single-subject requirement of article XI, section 3 of the Florida Constitution, that the ballot title and summary comply with section 101.161(1), Florida Statutes (2008), and that the financial impact statement complies with section 100.371, Florida Statutes (2008). This opinion should not be construed as favoring or opposing the passage of the proposed amendment.
It is so ordered.
CANADY and POLSTON, JJ., concur.
ANSTEAD, J., concurs in result only.
PARIENTE, J., dissents with an opinion, in which QUINCE, C.J., and LEWIS, J., concur.
LEWIS, J., dissents with an opinion, in which PARIENTE, J., concurs.
PARIENTE, J., dissenting.
I dissent because the ballot title is affirmatively misleading and the ballot summary omits significant details that are critical to enabling a voter to cast an informed vote on the merits of the amendment. Our task, of course, is not to judge the merits of the proposal, but to ensure that the ballot title and summary are not affirmatively misleading and that they clearly and accurately explain the amendment.
The ballot title in this case states that citizens are being given a "Right to Decide Local Growth Management Plan Changes." In reality, however, the amendment gives the voters only a limited opportunity to approve or disapprove plans or amendments, an opportunity that requires a series of onerous prerequisites before voter approval takes place.[2] Although the reference to the process for voter approval via petition and then ultimately voter approval via referendum is referred to in the fifty-two word accompanying summary, the ballot summary itself omits the significant details providing that the voter must sign the petition in person by appearing "at the office of the appropriate County Supervisor of Elections or City Clerk" and that the "signer must present at the time of such signing evidence showing the person's qualification as a voter of the local government at the time of the signing of the petition." Further, the opportunity is greatly limited by time: the requirement that a petition contain signatures of at least ten percent of those persons registered to vote must be met "within sixty days from the date of the first signature on the petition." Although it is true that a summary need not provide every detail in its seventy-five word explanation, the summary in this case is only fifty-two words and thus, it could have easily included the "in person" requirement and the sixty-day time limit, which constitute significant details because they are limitations on the petition process of which an average voter would be uninformed.
There is no question that the purpose of the ballot and summary is to fairly and accurately explain the amendment in order to allow the voter to make an informed and intelligent vote. In the case of citizen initiatives we have emphatically stated:
The citizen initiative constitutional amendment process relies on an accurate, objective ballot summary for its legitimacy. Voters deciding whether to approve a proposed amendment to our constitution never see the actual text of the proposed amendment. They vote based only on the ballot title and the *126 summary. Therefore, an accurate, objective, and neutral summary of the proposed amendment is the sine qua non of the citizen-driven process of amending our constitution.
Advisory Op. to Att'y Gen. re Indep. Nonpartisan Comm'n to Apportion Legislative & Cong. Dists. Which Replaces Apportionment by Legislature, 926 So.2d 1218, 1227 (Fla.2006) (Apportionment) (emphasis added) (quoting Advisory Op. to Att'y Gen. re Additional Homestead Tax Exemption, 880 So.2d 646, 653-54 (Fla.2004)). This is not only mandated by this Court, but it is also required by statute. Section 101.161(1), Florida Statutes (2008), provides in relevant part that "[w]henever a constitutional amendment ... is submitted to the vote of the people, the substance of such amendment ... shall be printed in clear and unambiguous language on the ballot." (Emphasis added.) The requirements of the ballot title and summary are twofold: "[T]he substance of the amendment... shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure.... The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of." § 101.161(1), Fla. Stat. (2008).
Further, we have explained that section 101.161(1), which sets forth the statutory requirements for the title and summary, "is a codification of the accuracy requirement implicit in article XI, section 5 of the Florida Constitution." Land Use Plans 2005, 902 So.2d at 770. "[This] accuracy requirement in article XI, section 5, functions as a kind of `truth in packaging' law for the ballot." Armstrong v. Harris, 773 So.2d 7, 13 (Fla.2000). For this reason, we struck as misleading a ballot summary that stated that the initiative would establish an "independent nonpartisan commission" for legislative redistricting when the method proposed in the amendment was in fact partisan. See Apportionment, 926 So.2d at 1228-29. On the other hand, we have allowed public policy statements if they accurately reflected the substance of the amendment. See, e.g., Advisory Op. to Att'y Gen. re Limiting Cruel & Inhumane Confinement of Pigs During Pregnancy, 815 So.2d 597, 597 (Fla.2002) (approving ballot summary that provided that "[i]nhumane treatment of animals is a concern of Florida citizens"); High Speed Monorail, 769 So.2d at 368 (approving ballot summary stating that the amendment's purpose was to "reduce traffic and increase traffic alternatives").
In this case, the sponsors are very clear that this proposal is intended to give the voters an alternative to the other citizen initiative that has been approved for placement on the ballot which would "subject all comprehensive land use plans and amendments to voters, thus balancing competing interests without over-burdening voters." See, e.g., Land Use Plans 2005, 902 So.2d at 763; Advisory Op. to Att'y Gen. re Referenda Required for Adoption and Amendment of Local Government Comprehensive Land Use Plans, 938 So.2d 501 (Fla.2006). Certainly the goal of providing voters with an alternative to the amendment requiring a vote on all comprehensive land-use plans is not improper or impermissible. There is also nothing wrong with giving voters only a "limited opportunity" to disapprove by vote the government's approval of a comprehensive land-use plan or amendment. However, what the sponsors cannot do is mislead the voter by drafting a title and summary that do not accurately reflect the actual substance of the amendment. In my view, this is exactly what has occurred in this case. This amendment does not provide a "right to decide" but rather, a "limited opportunity" that will only be activated if ten percent of the registered voters appear in *127 person at the elections office to sign a petition within sixty days of the first signature.
We have attempted to make clear that this Court will not tolerate misleading titles, especially when the title is not generic and includes a phrase that is misleading as to the actual intent of the amendment. I echo Justice Lewis's words in our most recent opinion on this issue in which we eschewed the use of "catch phrases" or "wordsmithing" in an attempt to win voter approval. Writing for a unanimous court, Justice Lewis recognized:
In recent years, advantageous but misleading "wordsmithing" has been employed in the crafting of ballot titles and summaries. Sponsors attempt to use phrases and wording techniques in an attempt to persuade voters to vote in favor of the proposal. When such wording selections render a ballot title and summary deceptive or misleading to voters, the law requires that such proposal be removed from the ballotregardless of the substantive merit of the proposed changes. Indeed, the use or omission of words and phrases by sponsors, which become misleading, in an attempt to enhance the chance of passage, may actually cause the demise of proposed changes that might otherwise be of substantive merit. If a sponsorwhether it be a citizen-initiative group, commission, or otherwisewishes to guard a proposed amendment from such a fate, it need only draft a ballot title and summary that is straightforward, direct, accurate and does not fail to disclose significant effects of the amendment merely because they may not be perceived by some voters as advantageous. The voters of Florida deserve nothing less than clarity when faced with the decision of whether to amend our state constitution, for it is the foundational document that embodies the fundamental principles through which organized government functions.
Fla. Dep't of State v. Slough, 992 So.2d 142, 149 (Fla.2008).
Accordingly, the use of the term "right to decide" is affirmatively misleading, and the failure to explain the significant restrictions on the petition process omits details critical to ensure an intelligent vote in the voting booth. For these reasons, I respectfully dissent.
QUINCE, C.J., and LEWIS, J., concur.
LEWIS, J., dissenting.
I cannot join the erroneous decision of the majority, which authorizes a misleading and deceptive ballot title and summary to be placed before Florida voters on a future election ballot. In Florida Department of State v. Slough, 992 So.2d 142, 149 (Fla.2008), this Court noted that "[i]n recent years, advantageous but misleading `wordsmithing' has been employed in the crafting of ballot titles and summaries. Sponsors attempt to use phrases and wording techniques in an attempt to persuade voters to vote in favor of the proposal." This misleading and deceptive ballot title and summary perpetuates the unfortunate trend of creative "wordsmithing" rather than adhering to the requirements of the law. A ballot title and summary can neither "fly under false colors" nor "hide the ball" with regard to the true effect of an amendment, Armstrong v. Harris, 773 So.2d 7, 16 (Fla.2000); however, the ballot title and summary here do both by making empty promises and failing to advise voters of critical aspects of the proposal.

Creation of a "Right"
The deception commences with a misleading ballot title: "Florida Growth Management Initiative Giving Citizens the Right to Decide Local Growth Management *128 Plan Changes." (Emphasis supplied.) A "right" is defined as "[a] power, privilege, or immunity secured to a person by law." Black's Law Dictionary 1347 (8th ed.2004) (emphasis supplied). The use of this word in the title clearly implies that if voters approve this amendment, they will have a right to vote on any proposed local-growth-management changes. However, one need look no further than the actual text of the proposal to reveal the deceptiveness of this title, for the text announces that the amendment only allows for "a limited opportunity for voters to approve or disapprove these plans or amendments." (Emphasis supplied.) Hence, even the sponsors recognized that the instant amendment does not create a right, but only a very limited opportunity which is contingent upon the occurrence of multiple preconditions. Such a false promise is patently misleading.
This Court has previously stricken amendments from the ballot where the titles and summaries have purported to promote greater rights or impose additional restrictions on government, but have in fact actually limited existing rights or relaxed existing restrictions. In Armstrong, this Court held that a ballot title, which read "United States Supreme Court Interpretation of Cruel and Unusual Punishment" and a summary, which provided that the proposed amendment "[r]equires construction of the prohibition against cruel and/or unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment," were affirmatively misleading. See 773 So.2d at 16-17. This Court explained that although the title offered the impression that "the amendment will promote the rights of Florida citizens through the rulings of the United States Supreme Court," the amendment actually restricted the rights of Floridians because the United States Constitution ban against cruel and unusual punishment provided fewer protections than the Florida Constitution ban on cruel or unusual punishment. See id. at 17. This Court ultimately concluded that the amendment "flew under false colors" because "a citizen could well have voted in favor of the proposed amendment thinking that he or she was protecting state constitutional rights when in fact the citizen was doing the exact oppositei.e., he or she was voting to nullify those rights." Id. at 18.
In Askew v. Firestone, 421 So.2d 151, 153, 156 (Fla.1982), this Court struck a proposed amendment from the ballot with a title, "Financial Disclosure Required Before Lobbying by Former Legislature and Statewide Elective Officers," and a summary which provided that the proposed amendment would impose financial-disclosure restrictions on former legislators and elected officials who sought to lobby before any state government body. This Court concluded that the proposed amendment "flew under false colors" because the summary failed to note that the amendment would actually abolish an existing two-year complete ban on such lobbying activities:
Although the summary indicates that the amendment is a restriction on one's lobbying activities, the amendment actually gives incumbent office holders, upon filing a financial disclosure statement, a right to immediately commence lobbying before their former agencies which is presently precluded. The problem, therefore, lies not with what the summary says, but, rather, with what it does not say.
....
If the legislature feels that the present prohibition against appearing before one's former colleagues is wrong, it is *129 appropriate for that body to pass a joint resolution and to ask the citizens to modify that prohibition. But such a change must stand on its own merits and not be disguised as something else.

Id. at 155-56 (emphasis supplied) (footnote omitted).
In the instant case, the title of the proposed amendment similarly "flies under false colors" with its false promise that it creates a "right." The misleading nature of this title is further compounded by the fact that significant prerequisites and extreme limitations to referenda under the proposal render this purported "right" almost completely illusory.

Prerequisites and Limitations to Referenda
The ballot summary is also misleading because it completely fails to mention the onerous preconditions that must be satisfied before a voter can make any attempt to obtain a referendum on a local-growth land-management plan change. Although the summary notes that ten percent of county or city voters must sign a Florida Growth Management Initiative Petition to obtain a referendum, the summary does not mention that the amendment requires a registered voter who desires a referendum to not merely sign and petition for relief, but to travel to his or her local elections office to sign the petition only in that location. Thus, under the amendment, individuals who seek a referendum may not set up a public kiosk at a local library, market, or government building where voters may sign the petition, as is the customary and traditional method of citizen involvement. Thus, a means that is commonly employed to obtain signatures for placement of an initiative amendment on the ballotsuch as the amendment filed by the sponsor in this caseis not available under this proposal.
Although an elections office may be accessible to many citizens, this is clearly not the case for all. For example, a Florida voter living in a distant corner of a Florida county may be forced to travel hundreds of miles roundtrip to sign a petition that is housed at the County Supervisor of Elections Office located in a distant location. For a retired senior citizen who is living on a fixed income, or a citizen barely meeting expenses and feeding his or her family, an attempt to invoke this purported "right" to a referendum would consume both significant time and moneymoney that may not be available in these economically stressed timesas to be a practical impossibility. The ballot title and summary mention nothing of this onerous requirement and, in my opinion, clearly "hide the ball" with regard to a very significant and most uncommon aspect of the proposed amendment.
A second limitation on the exercise of this so-called "right" to vote on growth-management plans that is omitted from the summary is the time limitation within which the required signatures must be acquired. Under the amendment, a referendum petition must be submitted to the County Supervisor of Elections or the City Clerk within sixty days from the date of the first signature on the petition. This sixty-day deadline is fixed regardless of the size of a city or county. Hence, under this proposed amendment, for there to ever be a referendum in Broward County on a growth-management plan, more than 103,000 registered voters[3] would need to travel to the Broward County elections *130 office during a period of two months to sign a petition. Even if those offices were open seven days a week (which I assume they are not), an average of at least 1,717 signatures would need to be obtained per day for the required number of signatures to be collected within the sixty-day timeframea clearly unrealistic feat. The ballot summary in this case "hides the ball" because it fails to describe that such a restriction, which is mandated by the amendment, will render it virtually impossible for the "right" to vote on a land growth management plan to come to fruition. See generally Advisory Opinion to Attorney Gen. re Stop Early Release of Prisoners, 642 So.2d 724, 726-27 (Fla. 1994) (ballot summary that stated the proposed amendment "ensures" inmates would serve at least eighty-five percent of their sentences was "inaccurate and seriously misleading" for the failure to mention the pardon and clemency powers of the Governor and the Cabinet; Court concluded that the summary would "mislead[] voters into believing that the amendment is ironclad, when in fact it expressly leaves the Governor and Cabinet an easy, cheap, and relatively painless method of defeating the entire purpose stated in the summary" (emphasis supplied)).

Preemption
Finally, the ballot title and summary are deceptive because they fail to inform the voters of a chief purpose of the proposed amendment: preemption of all other land-use proposals, including one, the wording for which has already been approved by this Court, that actually creates the right for a citizen vote that the ballot title here falsely promises. In 2006, we approved the wording for placement on the ballot of a proposed amendment that would require local governments to submit to a vote any new comprehensive land-use plan, or an amendment to an existing comprehensive land-use plan, prior to adoption. See Advisory Opinion to Attorney Gen. re Referenda Required for Adoption & Amendment of Local Gov't Comprehensive Land Use Plans, 938 So.2d 501, 501-02, 506 (Fla.2006) (Land Use Plans). The text of that proposed constitutional amendment expressly guarantees a right to voter approval with regard to land-use-plan changes:
Public participation in local government comprehensive land use planning benefits the conservation and protection of Florida's natural resources and scenic beauty, and the long-term quality of life of Floridians. Therefore, before a local government may adopt a new comprehensive land use plan, or amend a comprehensive land use plan, such proposed plan or plan amendment shall be subject to vote of the electors of the local government by referendum, following preparation by the local planning agency, consideration by the governing body as provided by general law, and notice thereof in a local newspaper of general circulation. Notice and referendum will be as provided by general law. This amendment shall become effective immediately upon approval by the electors of Florida.
Id. at 502 (emphasis supplied).
The proposal in the instant case notes under the "Statement and Purpose" section that one purpose of the amendment is to "pre-empt or supersede recent proposals to subject all comprehensive land use plans and amendments to votes." Despite this express language, the ballot title and summary for this proposed amendment is completely silent with regard to the fact that one of the chief purposes of this amendment is to vitiate or overrule the effects of the proposed amendment in Land Use Plans. Rather than highlight *131 this significant effect of the proposal, the ballot title instead deceptively proclaims that the instant amendment creates a "right." I conclude that the wording techniques here have produced a title and summary that misleads by omission, and therefore "hides the ball." See Advisory Opinion to Attorney Gen. re Term Limits Pledge, 718 So.2d 798, 803 (Fla.1998) ("A ballot summary may be defective if it omits material facts necessary to make the summary not misleading." (quoting Advisory Opinion to Attorney Gen.Limited Political Terms in Certain Elective Offices, 592 So.2d 225, 228 (Fla.1991))); see also Armstrong, 773 So.2d at 18 (ballot summary was misleading and "hid the ball" where it failed to state the primary effect of the amendment; i.e., to change the Cruel or Unusual Clause of the Florida Constitution to prohibit cruel and unusual punishment).
Like the misleading ballot title and summary that were stricken in Askew, the problem here "lies not with what the summary says, but, rather, with what it does not say." 421 So.2d at 156; see also Term Limits Pledge, 718 So.2d at 804 ("When the summary of a proposed amendment does not accurately describe the scope of the text of the amendment, it fails in its purpose and must be stricken." (emphasis supplied)). I cannot agree with the majority that a ballot summary that fails to disclose multiple prerequisites to exercising a purported "right" and is silent with regard to the fact that the proposed amendment has the potential to destroy rights that would be created by a separate constitutional amendment does not "hide the ball" and is not misleading. Instead, voters must know about these prerequisites and the purpose behind this proposal to be able to make an informed decision in the voting booth. I simply cannot join an opinion which not only allows but, by approval, encourages deception upon the Florida voters.
Indeed, fair notice could be provided to voters by minor edits to the ballot title and summarywithout exceeding the statutory word limits. For example, the following revisions produce a ballot title and summary that is accurate with regard to the proposed amendment:
Florida Growth Management Initiative Giving Citizens the Right Creating Limited Opportunity to Decide Vote on Local Growth Management Plan Changes
Allows Floridians to call for voter approval ofa limited opportunity to vote on changes to local growth management plans through a citizen petition. Voter approval of growth management plan changes will be required if 10% of the voters in the city or county sign within sixty days at the local election office a petition calling for such a referendum. Defines terms and establishes petition requirements. Preempts all other land use proposals.
As revised, this title and summary provide the clarity and accuracy that section 101.161(1), Florida Statutes, requires which the current title and summary lack.
I do not address the wisdom of a proposed constitutional amendment that addresses voter approval of land-use changes or the conditions placed upon a referendum with regard to strict time and location requirements. However, as a member of this Court, I have a duty to ensure that the ballot title and summary to a proposed amendment are fair and accurate and that voters are fairly informed. See generally Advisory Opinion to the Attorney Gen. re Tax Limitation, 644 So.2d 486, 490 (Fla. 1994) (noting that it is this Court's responsibility to ensure the clarity of ballot titles and summaries in accordance with section 101.161(1), Florida Statutes); Armstrong, 773 So.2d at 13-14 (the accuracy of the title and summary is "of paramount importance" *132 because the text of the constitutional amendment will not be present in the voting booth). The merit of the substance of the proposed amendment is not within our responsibilitytruthful disclosure to our citizen voters is our highest obligation.
Here, the intent of the amendment is to preempt another proposal that creates the right to a referendum for any changes to a land-use plan. The ballot title and summary should state this plain truth; instead, the title falsely touts the creation of a "right." Creative wordsmithing that cloaks the true purpose of this amendmentan amendment that actually limits the voice of Florida voters with regard to growth-management-plan changesin an attempt to ensure passage is contrary to the basic tenet of our democracy that voters receive fair notice of proposed constitutional changes. See Armstrong, 773 So.2d at 13 ("All that the Constitution requires or that the law compels or ought to compel is that the voter have notice of that which he must decide .... What the law requires is that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot.") (quoting Askew, 421 So.2d at 154-55). As this Court recently noted, "[t]he voters of Florida deserve nothing less than clarity when faced with the decision of whether to amend our state constitution, for it is the foundational document that embodies the fundamental principles through which organized government functions." Slough, 992 So.2d at 149.
I regret that the majority has failed Florida's voters by approving this patently misleading amendment for placement on a future election ballot. Therefore, I dissent.
PARIENTE, J., concurs.
NOTES
[1] Hometown Democracy's remaining challenges to the ballot title and summary, specifically its arguments concerning the use of the terms "citizens" and "Floridians" in the title; the use of term "changes" throughout the title and summary; the failure to disclose that some local governments have provided voters with some rights to vote on changes to local land use plans; and the lack of specificity concerning what local government plans would be impacted by the proposed amendment are without merit and do not warrant detailed discussion.
[2] Indeed, the full text of the amendment actually uses the term "limited opportunity."
[3] The website for the Broward County Supervisor of Elections states that there are 1,030,632 registered voters in Broward County. See Broward County Supervisor of Elections, Voter Registration Statistics Summary, http://www.browardsoe.org/VRStats.aspx? Summaries=1 (last visited December 16, 2008).